# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**UNITED STATES OF AMERICA** :
:
**v.** : **CRIMINAL ACTION FILE**
:
**JEROME BUSHAY,** : **NO. 1:10-CR-521-01-TCB/AJB**
:
**Defendant.** :

## ORDER FOR SERVICE OF
## REPORT AND RECOMMENDATION

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b).  Let the same be filed, and a copy of the R&R,

together with a copy of this Order, shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within fourteen (14) days of service of this Order.  Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and be served upon the opposing party.  *See*

*United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990).  The party filing

objections will be responsible for obtaining and filing the transcript of any evidentiary

hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), the above-referenced fourteen (14) days allowed for filing objections is **EXCLUDED** from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed. If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses, and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this the  24th  day of January, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | |
| **JEROME BUSHAY,** | : | **NO. 1:10-CR-521-01-TCB/AJB** |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND
## FINAL REPORT AND RECOMMENDATION

Before the Court are the following pretrial motions filed by Defendant Jerome

Bushay: (1) motion to suppress statements, [Doc. 155]; (2) motion to suppress

evidence, [Doc. 156]; (3) first motion to suppress search and seizure re: 943 Peachtree,

Apt. 707, [Doc. 278], supplemented by Document 326; (4) first motion to suppress

search and seizure re: 6746 Grey Rock Way, [Doc. 279], supplemented by

Document 327; (5) motion to suppress search and seizure re: hotel room, [Doc. 280];

(6) motion to suppress search and seizure re: traffic stop, [Doc. 282]; and (7) motion

to sever defendant re: *Bruton* problem, [Doc. 283]. For the following reasons, the

undersigned **RECOMMENDS** that the all of the suppression motions be **DENIED**

except that it is **RECOMMENDED** that the motion to suppress search and seizure re:

traffic stop, [Doc. 282], be **GRANTED AS MOOT**.  Further, the severance motion, [Doc. 283], is **DEFERRED** to the District Court.

### I. *Motion to suppress statements, [Doc. 155]; motion to suppress evidence, [Doc. 156]; and motion to suppress search and seizure re: hotel room, [Doc. 280]:*

These motions concern Bushay's arrest on December 15, 2010, in Tampa, Florida, the search of a hotel room, and statements made by Bushay.  The Court held an evidentiary hearing on the motions.  [Doc. 449].

### A. Facts

On the morning of December 15, 2010, Pinellas County Sheriff's Office Detective/DEA Task Force Officer ("TFO") Jeff McConaughey was called by DEA Atlanta TFO T.K. Gordon, who advised that several individuals indicted in Atlanta, and for whom arrest warrants had issued, were in the Tampa area.  Transcript ("T") 11 [Doc. 449].  Gordon identified the subjects and told McConaughey where these individuals supposedly were located.  T11, 30.  At the time of Gordon's call, McConaughey was independently conducting an investigation in Tampa of one of Bushay's co-defendants, Christopher Williams. T31. McConaughey assembled a team of DEA agents and TFOs and went to an area northeast of Tampa near the fairgrounds, where there were several hotels.  T11-12.  At first, the agents did not know the specific

2

hotel where the subjects were staying, but they knew through Title III wire intercepts that the subjects were located in room 308 of one of the hotels in that area. T12, 31. Surveilling agents observed two subjects, identified as Bushay and Williams, leave the Fairfield Inn in a silver or light blue Honda van,[1] and agents surveilled them to a IHOP restaurant closer to downtown Tampa. T12-13, 36. By this time, there were 10 to 15 DEA agents, TFOs, and Tampa Police officers in the law-enforcement team. T16.

McConaughey arrived at the IHOP at noon and saw Williams walking back towards the van. Agents already on the scene told McConaughey that the van's other occupant (Bushay, in the driver's seat) was still in the vehicle. T14, 34.[2] As the Honda van was preparing to leave the parking lot, the takedown signal was given and McConaughey blocked the van with his vehicle. T14. With his gun drawn, McConaughey removed Bushay from the van, placed him in handcuffs and put him on the ground, and at the same time other agents descended on the van and arrested Williams. T15, 16.

---

[1]     Another individual, a Mr. Lobban, was in a separate van. T35, 40.

[2]     McConaughey knew who Williams was because he was investigating him. He did not know Bushay, nor had he seen a photograph of him prior to the arrests. T36.

3

McConaughey was dressed in street clothes but was wearing a tactical vest clearly identifying him as a police officer, along with a gun belt and his badge. T15-16. In searching Bushay, McConaughey found plastic credit-card type hotel room keys in a key sleeve. T16. He told Bushay that there were warrants for his arrest, but did not tell him the nature of the charges. T17.[3] Bushay was placed in the back of a marked police car. T17, 18. He was not given his *Miranda* rights at that time because there was no intention to question him at the scene. T17. McConaughey turned the plastic keys over to his group supervisor and then went to the DEA office. T18, 33. The entire episode at the IHOP lasted less than 10 minutes. T18. The agents did not linger at that location because it was lunchtime at the business. T18. The DEA office was a 5-minute drive from the IHOP. T18.

Once at the DEA office, McConaughey took Bushay to the processing and interview room.[4, 5] The room was 12 feet by 12 feet and contained a large desk with

---

[3] McConaughey did not tell Bushay the nature of the charges because he did not want to compromise the investigation in Atlanta since other persons were being arrested that day. T17.

[4] Bushay was placed briefly in a cell. T19.

[5] Williams was also processed. After being detained, Lobban was released. T40.

4

multiple chairs.  T27.  McConaughey was no longer armed, nor was he wearing his

tactical vest.  T27.  McConaughey did not threaten Bushay nor make him any promises.

T27.  McConaughey read Bushay his rights from a DEA Form 13A, (Gov't Exh. 7).

T21.[6]  In response, Bushay replied, "Yes, I'll talk to you."  T22.  McConaughey did not

present Bushay with a written waiver form.  T41.  McConaughey began by asking

Bushay some basic questions about his presence in Florida, since McConaughey did

not know much about the Atlanta investigation.  Bushay told him about coming into

town and staying at the hotel, followed by McConaughey asking whether Bushay had

any property left at the hotel.  T22.  Bushay responded that he had left a gun in the hotel

---

[6]     Those rights were as follows:

Before we ask you any questions, you must understand you have the right
to remain silent.  Anything you say can be used against you in court.  You
have the right to talk to a lawyer for advice before we ask you any
questions and to have a lawyer with you during questioning.  If you
cannot afford a lawyer, one will be appointed for you before any
questioning, if you wish.  Do you understand?  Are you willing to answer
some questions?

T21.

AO 72A
(Rev.8/8
2)

night stand. T22, 33.[7]   Other agents were sent to the hotel with the plastic keys to

retrieve the gun. T24.

DEA Task Force Agents Nicholas Marolda and Dexter McGee went to the

Fairfield Inn at about noon to seize the firearm left in room 308. T47, 48, 49.[8] Marolda

was dressed in plain clothes, with his firearm covered by his shirt but his badge

displayed. T49. The agents expected the room to be empty. T48, 66. They contacted

the hotel manager, told him they were going to be entering a room, and he accompanied

them to the floor where room 308 was located, but stayed down the hall. T48, 67. The

agents knocked on the door, and after 10 to 20 seconds, were surprised when Keisean

Scarlett opened the door.[9] T48-49, 68.[10] Scarlett appeared as if he had just woken up.

T49. Marolda identified himself as a law-enforcement agent. T49. Scarlett tried to

---

[7]      Based on wire intercepts, the agents already knew in what hotel room the
subjects were staying. T23. Seeing Bushay, Williams, and Lobban leave the Fairfield
Inn, together with the plastic keys seized from Bushay when he was arrested, confirmed
for the agents that room 308 was at the Fairfield Inn.

[8]      The hotel was a 30-minute drive from the DEA's office. T67.

[9]      Marolda did not use the plastic key seized from Bushay to gain entry into
the room. T80.

[10]      Scarlett was the registrant for room 308, but at the time of their initial
approach to the room, the agents did not know that. Gov't Exh. 5; T51, 70. The
registration form reflected that cash was paid for the one-night room rental and there
was to be one guest in the room. Gov't Exh. 5; T51-52.

shut the door, but Marolda stuck his foot in the door. T68. Scarlett turned around and moved towards the bed. T50. The agents drew their weapons. T51. Since Marolda assumed there was a firearm in the room, he did not enter the room, but rather verbally commanded Scarlett to return to the door while showing his hands and get on the floor. T50, 70. Scarlett complied and was handcuffed. T50, 70.

Scarlett told the agents, and they observed, that another person, subsequently identified as Chadwick Williams, was in the room sleeping. T49, 50, 70-71. He was told to show his hands, and after several requests, he complied and was secured. T49, 50, 71. Scarlett and Chadwick Williams were placed in the hallway inside the hotel room. T72. Securing both subjects took about 45 seconds. T72. The room was swept for the presence of any other persons. T72, 73.

After sweeping the room, the agents brought Scarlett and Williams back into the room. T73.[11] One was seated on a chair and another was placed on a bed. T75. Marolda asked for their names and dates of birth. T72-73, 77. Marolda explained they were there to search the room for a firearm. T49.

───────────────────

[11]      The agents also called the Hillsborough County Sheriff's Office for backup and uniformed presence. T77, 79.

7

Scarlett told Marolda that he had gotten into the room, took a shower and fell asleep, and that is why he was slow in answering the door. T54. Marolda asked him if there was a gun in the room, and he replied that it was in the night stand between the beds. T54. Marolda asked him if he knew the gun was there and if he touched it; Scarlett responded he knew it was there, he touched it and was going to call "Jerome" to ask why he left the gun in the room. T54, 76.[12]

Marolda seized the firearm from the night stand, and gave it to McGee, who cleared it and secured it. T54, 76-77. A warrants-and-criminal-history check was run (to see if Scarlett or Williams were convicted felons), with negative results. T77, 78.

At approximately 12:35 p.m., Scarlett and Williams signed a consent-to-search form for the room, Gov't Exh. 3; T52-53, but Marolda could not say whether the form was signed before or after the firearm was seized. T78. He also testified that he "had consent to search the room - - verbal consent to search the room and then we had written - - and then we received written consent as well." T81; *see also* T83.

---

[12]    A subsequent Firearms Trace Summary reflected that the firearm was not registered to Bushay. Gov't Exh.6; T58.

AO 72A
(Rev.8/8
2)

The questioning of Scarlett and Williams took approximately 30 minutes. T77. They were then uncuffed and walked downstairs to the manager's office, where Scarlett and Williams were asked by the management to leave the hotel. T77.[13]

Meanwhile, back at the DEA office, Gordon called McConaughey on his cell phone around 1:17 p.m. T24, 25, 41. McConaughey handed the phone to Bushay in order for Gordon to record a voice exemplar. T24-25. Although McConaughey could not hear Gordon's side of that conversation, Bushay did not invoke his right to an attorney while speaking with Gordon, T28, nor did he invoke his right to remain silent. T29.[14] After Bushay spoke with Gordon, McConaughey began questioning Bushay about the Atlanta case, particularly whether Williams was involved in the Atlanta case with him. T28, 44. At that point, Bushay responded that, "I better talk to an attorney first." T28, 43; *see also* T45. McConaughey did not question Bushay further. T28.

_____

[13]    Williams also signed a consent-to-search form for his vehicle after he was back in his vehicle. Gov't Exh. 4; T54, 79. The record does not reflect either the time the consent-to-search form was signed nor the results of that search. *See* Gov't Exh. 4; T79.

[14]    The audio recording and transcript of the telephone conversation between Bushay and Gordon were marked as exhibits but not admitted at the hearing. Gov't Exhs. 1, 2; T25-26.

AO 72A
(Rev.8/8
2)

**B. Issues**

The evidence at the hearing and the parties' post-hearing briefs raise three issues to be decided: Bushay's standing to challenge the search and seizure of the firearm from room 308 of the Fairfield Inn; if he has standing, whether the gun was properly seized; and whether his post-arrest statements were obtained in compliance with *Miranda* and were otherwise voluntary.

**C. Discussion**

**1. Bushay's Standing**

**a. Contentions of the Parties**

Bushay argues that he has standing to challenge the search of the hotel room and the seizure of the firearm. [Doc. 461 at 7]. He contends that the record demonstrates that he had a privacy interest in the room as a social guest at room 308 of the Fairfield Inn, since (1) the wire intercept disclosed he was staying in room 308; (2) he was observed leaving from the Fairfield Inn; (3) he was found to be in possession of plastic room keys from the hotel (although he recognizes that possession of the keys alone does not establish standing); (4) the record contains no other evidence of keys to room 308, [*id.* at 8]; (5) the hotel registry lists one guest in addition to Scarlett in the room, [*id.* at 8-9]; (6) there is no evidence in the record to suggest that Bushay's

10

presence in the hotel room was for an illegal purpose, and thus as a social guest, he had the same expectation of privacy as he would have in his own home, [*id.* at 9-10]; (7) his possession of two keys reflects the hotel management's recognition that more than one person was staying in room 308, [id. at 10]; (8) the occupants of the room had not checked out, nor had they abandoned the room, [*id.*][15]; (9) McConaughey's testimony that "[i]t was implied because [Bushay] said, 'I left a gun in the night stand,' " [*id.* at 11 (quoting T33)], means that law enforcement thought it was his room; (10) he left an expensive item (the firearm) in the hotel room, which is an indicia of his expectation of privacy; and (11) the wire intercepts disclosed that Bushay had arrived late from Atlanta, was staying in room 308 and there is no evidence that he stayed anywhere else, [*id.* at 12].

Bushay also argues that he had a possessory interest in the firearm seized which, he contends, was interfered with even if he does not have a privacy interest in the placed searched. [*Id.* at 12].

---

[15] Curiously, he then argues that "the registered guest was still in Room 308, in bed," [Doc. 461 at 10], presumably referring to Chadwick Williams. Such an argument cuts against his claim of having an expectation of privacy in the hotel room as a result of there being one registered guest, assuming that that reference on the hotel bill is to a guest in addition to the person who registered for the room, Scarlett.

AO 72A
(Rev.8/8
2)

In response, the government argues that Bushay has failed to allege sufficient facts to establish standing to challenge the search of room 308. It argues, based on the four-factor test set out in *United States v. Carter*, 854 F.2d 1102, 1105 (8th Cir. 1988), which the government asserts was approved by the Eleventh Circuit in *United States v. Cooper*, 203 F.3d 1279 (11th Cir. 2000), first, that Bushay was not in the room at the time of the search. It contends that there is no testimony that Bushay was ever inside the room, but only that he was in the parking lot of the hotel premises. [Doc. 465 at 8]. It further claims that Bushay never told McConaughey which room he was staying in, nor that he was "staying" in any hotel room, but rather that he left a firearm in the night stand of a hotel room, which McConaughey inferred was room 308 from the wiretap. [*Id.* at 8-9].

Next, the government contends that the evidence demonstrates that Bushay did not pay, check in, or register for the room. It asserts that the keys taken off Bushay were never described as fitting room 308. [*Id.* at 9]. The government then argues that there is no evidence that Bushay had any personal belongings in the hotel room, other than the firearm. As to the firearm, the government argues that Bushay is not entitled to the inference that he was a guest in the hotel room because the firearm was found there, contending that it is equally plausible that Bushay never entered the room and

12

AO 72A
(Rev.8/8
2)

gave the gun to Scarlett for safekeeping. [*Id.* at 10]. It further argues that, because

Scarlett and Chadwick Williams were in the room, Bushay had no ability to exclude

others from it. [*Id.* at 11].

The government also argues that Bushay has failed to demonstrate that he fit

within the definition of a "social guest" in the hotel room because he did not establish

that he was a guest for personal, rather than commercial purposes, as required by

Eleventh Circuit precedent. [*Id.*].[16] The government concedes that there is no evidence

in the record that Bushay was using the hotel room for narcotics trafficking, but

contends that the evidence makes it highly unlikely that Bushay, Scarlett, Chadwick

Williams and Christopher Williams were staying in the hotel room for social reasons,

and in any event there is no evidence that Bushay was ever in the room. [*Id.* at 11-12].

Fourth, the government argues that Bushay has not properly asserted a

possessory interest in the firearm apart from a privacy interest in the hotel room,

because while he knew of the gun's location, he was not present when the firearm was

seized, it was not registered in his name, and he lacked exclusive control over it.

[*Id.* at 13-14].

---

[16]     In arguing this point, the government referenced the Eleventh Circuit's
*Cooper* decision, 203 F.3d at 1283 n.3, but actually cited to *United States v. Garcia*,
854 F.2d 1280, 1283 (11th Cir. 1988).

AO 72A
(Rev.8/8
2)

In his reply, Bushay argues that his and Scarlett's statements and the presence of the firearm clearly demonstrate that he was present in the room, contrary to the government's contention. [Doc. 468 at 2]. He argues that Scarlett's comments and call to him evidenced Bushay's belief that the firearm would be safe in the room and that he had not abandoned it. He argues that placing the firearm in the night stand or some other private place in the room demonstrates his level of authority, access, and control. [*Id.* at 3]. He also argues that McConaughey did not ask him directly whether he was staying in room 308 because it was obvious that he was. [*Id.* at 4-5].

He next argues that the *Cooper* and *Carter* cases upon which the government relies actually support his arguments. He contends that *Carter* is distinguishable because none of that defendant's personal belongings were left in the room, but in the present case, Bushay left an expensive firearm in the hotel room. As for the factors discussed in *Carter*, Bushay argues that he had been in the room and left property in the room; and while he concedes that the record does not reflect that he paid for the room, he contends that others could be excluded by his possession of the two room keys. [*Id.* at 7]. He further argues that a hotel guest that takes the keys with him demonstrates his intention to exclude others. [*Id.* at 8]. He then asks the Court to take notice of the intercepted calls, which demonstrate that the intercepting agents knew that

14

Bushay was in a hotel room numbered 308 but did not know the hotel in which the room was located, followed by Bushay being in possession of the keys upon his arrest, demonstrating dominion and control. [*Id.* at 8-9].

Bushay also distinguishes *Cooper*, where the registered guest had abandoned the room. In this case, Bushay argues, guests of the room were still sleeping inside the room. As to the government's argument that Bushay was arrested far from the room, Bushay argues that there is nothing unusual about an out-of-town guest going out to eat at lunchtime, and to accept the government's argument would be to find that a hotel guest cannot venture from his room. [*Id.* at 9-10]. He further contends that *Cooper* is different from this case because here there is no allegation that the hotel occupants used the room for unlawful purposes. [*Id.* at 10-11].

Finally, Bushay argues that contrary to the government's argument that he did not demonstrate a possessory interest in the firearm, his and Scarlett's statements and his placement of the firearm in the night stand establish his possessory interest. [*Id.* at 11-12].

### b.    Applicable Law

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. To challenge a seizure as violating the Fourth Amendment, a

15

defendant must have "standing,"[17] *i.e.*, a legitimate expectation of privacy in the premises. *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991); *see also United States v. Epps*, 613 F.3d 1093, 1097 (11th Cir. 2010) (" '[O]nly individuals who have a legitimate expectation of privacy in the area invaded may invoke the protections of the Fourth Amendment.' ") (quoting *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009)). As a result, the Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *Cooper*, 203 F.3d at 1284. The Fourth Amendment protects a person's reasonable expectation of privacy in his hotel or motel room. *Stoner v. California*, 376 U.S. 483, 489-90 (1964); *United States v. Mercer*,

---

[17] The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing" in this context. *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because the parties have used this term and courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

541 F.3d 1070, 1074 (11th Cir. 2008); *Cooper*, 203 F.3d at 1284; *United States v. Bulman*, 667 F.2d 1374, 1383-84 (11th Cir. 1982).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987); *see also United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006), and "requires that a person exhibit an actual expectation of privacy," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," *King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).

Courts assess on a case-by-case basis the standing of a particular person to challenge an intrusion by government officials into an area over which that person

17

lacked primary control. *Oliver v. United States*, 466 U.S. 170, 191 n.13 (1984). No one circumstance is dispositive in this inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy, and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *United States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. Unit A July 8, 1981)[18]; *see also Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980); *Rakas*, 439 U.S. at 147-49. As the very listing of these factors demonstrates, the expectation must be based on considerations outside of the Fourth Amendment. *Id.* at 142-145 n.12. The Eleventh Circuit has held that where the

---

[18]     The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, rendered prior to October 1, 1981. *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Productions, Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

18

defendant is neither the owner nor the lessee of the place searched, to be able to contest a search he must " 'demonstrate a significant and current interest' " in the property at the time it was searched. *United States v. Miller*, 387 Fed. Appx. 949, 951 (11th Cir. July 21, 2010) (quoting *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984). That is, the defendant may have a reasonable expectation of privacy in a hotel room he does not rent if he shows "an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee," *United States v. Baron–Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984). *Cf. id.* (discussing standing in context of home of third party).

Finally, the burden is on the defendant to show by a preponderance of the evidence that he had a legitimate expectation of privacy in the area searched. *Harris*, 526 F.3d at 1338; *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997); *United States v. Golphin*, No. 6:10-cr-291-Orl-28GJK, 2011 WL 2446561, at *1 (M.D. Fla. June 15, 2011) (citing *United States v. Cantley*, 130 F.3d 1371, 1377 (10th Cir. 1997), for the proposition that the movant must show by a preponderance of the evidence that he has a legitimate expectation of privacy).

19

AO 72A
(Rev.8/8
2)

### c.    Analysis

The Court concludes that Bushay has failed to establish a legitimate expectation of privacy in room 308 of the Fairfield Inn.  First, he did not establish a subjective expectation of privacy since he did not show that he had an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.  He has failed to establish that the hotel room was rented in his name, that he paid for the room, or that he was the registered additional guest.  *See Brazel*, 102 F.3d at 1147-48 (holding that defendant lacked a subjective expectation of privacy in an apartment because he had failed to show that "he was the tenant or had an unrestricted right of occupancy or control in the apartment at the time of the search").  The evidence shows that Scarlett was the registered lessee of the room by virtue of paying the rental fee and having his name on the hotel registry.  Gov't Exh. 5.  Although Bushay argues that he was the person referred to on the hotel registry as "guest," it is more likely that that term refers to the hotel's understanding that only one person was staying in the room.  In any event, in light of the fact that Chadwick Williams was asleep in the room at the time that law enforcement arrived (and at least one other person, Christopher Williams, also could

be said to have been an invited guest of the registrant), there is no evidence that Bushay was the "guest," as suggested by Bushay.

Other facts confirm that Bushay failed to prove a subjective expectation of privacy in room 308. Bushay described his presence in the area as having "met friends," T23, as opposed to, for example, directly stating that he was staying at the hotel. Also, he points to no evidence in the record showing that he referred to the room as "his" as opposed to "the" or "a" hotel room, which points to a conclusion that it was not his hotel room. And, while Bushay possessed two hotel room keys, he never proved that these keys in fact were the keys to room 308. In any event, as he concedes, possession of a key to a hotel room, without more, does not establish a reasonable expectation of privacy in the room. *Cooper*, 203 F.3d at 1286 n.7 (citing *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995)). Nor did Bushay prove that the vehicle he was operating was a vehicle that was "registered" for room 308.

Recognizing these facts, Bushay attempts to come under the rubric established in cases addressing "overnight guests." Even there, Bushay refers to his situation as that of a "social guest." In any event, Bushay did not demonstrate that he qualified as an overnight guest, as in *Minnesota v. Olson*, 495 U.S. 91, 99-100 (1990), nor was he using the hotel for lodging, as found in *United States v. Ramos*, 12 F.3d 1019

21

(11th Cir. 1994). Other than the firearm, Bushay produced no evidence that his personal belongings (such as suitcases or clothing) were in the hotel room. He only told McConaughey he was there to meet friends, not stay overnight in the hotel room. In short, in order to agree with his theory that he qualifies as an overnight guest with standing to contest the search, the Court would have to take the minimal evidence produced and stack inference upon inference in order to conclude that he had a legitimate expectation of privacy in the hotel room.

Moreover, that the agents believed he was staying in the room does not assist Bushay in proving standing, because a defendant may not establish standing by relying on the government's theory of the case. *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993); *United States v. McNeal*, 82 F. Supp. 2d 945, 950 (S.D. Ind. 2000); *see also United States v. Thompson*, 171 Fed. Appx. 823, 828 (11th Cir. Mar. 27, 2006) (concluding that motion to suppress relying on government contention that room was rented by defendant was insufficient to demonstrate standing to warrant an evidentiary hearing); *United States v. Henry*, No. 1:09-cr-522-TCB-GGB, 2010 WL 5559207, at *4 (N.D. Ga. Dec. 7, 2010) (R&R), *adopted at* 2011 WL 65762 (N.D. Ga. Jan. 7, 2011)) ("The Government correctly contends that Defendant cannot show standing simply through the contentions of Government agents or the theory of

22

the Government's case." (citing *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995)).

In addition, Bushay has failed to establish an objective expectation of privacy in room 308 because at most he was only a casual visitor. *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (making important distinction between overnight guests and casual guests, holding that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not"); *see also United States v. Larios*, 593 F.3d 82, 93 (1st Cir. 2010) (no objective expectation of privacy where defendant, who did not rent hotel room nor have key, stayed for a few minutes); *United States v. Rodríguez-Lozada*, 558 F.3d 29, 37 (1st Cir. 2009) (holding that a defendant who was "a casual visitor for a brief period" in another person's apartment had no reasonable expectation of privacy in the apartment); *United States v. Agapito*, 620 F.2d 324, 334 (2d Cir. 1980) (holding that a casual visitor to a hotel room does not have a legitimate expectation of privacy).

Next, the Court considers whether Bushay has standing to challenge the seizure of the firearm despite the fact that he has no standing to challenge the search of the hotel room or the night stand therein. At first blush, there is language in caselaw supporting this argument. In one case, the Eleventh Circuit appears to have recognized

23

that a person may possess standing when he has a reasonable expectation of privacy from governmental intrusion in the items seized. *United States v. Delgado*, 903 F.2d 1495, 1451 (11th Cir. 1990) (citing *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968)). In the context of an employee's right to challenge the seizure of personal items when his employer's premises were searched, the *Delgado* Court concluded as follows:

> As one commentator has stated, "[i]t may be significant . . . that [the item seized] is a personal possession of the defendant and not something connected with the operation of the business." 3 W. LaFave, Search and Seizure § 11.3, at 566 (1978). Indeed, it appears that, where the defendant's possession was the object of the search, the defendant has standing to challenge the search even though he does not have an expectation of privacy in the premises searched. *See United States v. Alewelt*, 532 F.2d 1165, 1167 (7th Cir. [ ] (1976); *see also Martinez[v. Nygaard*, 831 F.2d [822,] 826 [(9th Cir. 1987)] (court finds no standing based on fact that person had "no possessory interest in the place searched or things seized" (emphasis added)). We hold, therefore, that Escobar has standing to challenge the seizure of his shirt and the papers contained therein.

*Delgado*, 903 F.2d at 1502; *see also Lenz v. Winburn*, 51 F.3d 1540, 1550 n.10 (11th Cir. 1995) (stating that possessory interest is all that is needed for the Fourth Amendment's reasonableness requirement to apply to a seizure where "the search and the seizure were inextricably linked," and citing *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 63-64 (1992), and *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), which defined a Fourth Amendment seizure as "a meaningful interference with an individual's

AO 72A
(Rev.8/8
2)

possessory interest in that property" (emphasis added)); *Rakas*, 439 U.S. at 142 n.11 (which explained, in dicta, that casual visitor to another's house would not have standing to challenge the search of the house, noting that "[t]his is not to say that such visitors could not contest the lawfulness of the seizure of evidence or the search if their own property were seized during the search").

In *Soldal*, the Supreme Court held that

seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place. *See, e.g., Jacobsen*, [466 U.S. at 120-25]; [*United States v. Place*, 462 U.S. 696, 706-07 (1983)]; *Cardwell [v. Lewis*, 417 U.S. 583, 588-89 (1974)]. [ ] More generally, an officer who happens to come across an individual's property in a public area could seize it only if Fourth Amendment standards are satisfied - - for example, if the items are evidence of a crime or contraband. *Cf. Payton v. New York*, [445 U.S. 573, 587 (1980)].

*Soldal*, 506 U.S. at 68-69 (footnote omitted).

AO 72A
(Rev.8/8
2)

Despite this facially applicable language,[19] the Court first concludes that these cases are inapplicable to the standing issue in this case. *Delgado* and *Mancuso* involve the gray area of an employee's expectation of privacy during a search of his employer's premises. *Soldal* is distinguishable because that case did not involve Fourth Amendment standing or an expectation of privacy at all, but rather discussed whether the plaintiffs could bring a 42 U.S.C. § 1983 action against local law enforcement for the claimed unlawful seizure of their mobile home even if their privacy was not infringed under the Fourth Amendment. *Soldal*, 506 U.S. at 72. While the Court there concluded that an improper seizure was actionable, that case did not address the question in the present case: whether a defendant can assert an improper-seizure claim

---

[19]     As discussed in the text *supra*, the Court recognizes the language in *Delgado* but notes that in more recent cases, the Eleventh Circuit has steadfastly held that a " 'legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy.' " *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (quoting *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983)); *see also Rakas*, 439 U.S. at 143-44 & n.12; *United States v. Campbell*, 434 Fed. Appx. 805, 809 (11th Cir. July 13, 2011) ("Although possession or ownership is one factor courts may consider when determining whether a defendant has a legitimate expectation of privacy in an object, it 'is not a proxy for determining whether the owner had a Fourth amendment interest, for it does not invariably represent the protected Fourth Amendment interest.' ") (quoting *United States v. Salvucci*, 448 U.S. 83, 91 (1980)). Nonetheless, because the undersigned is not authorized to ignore *Delgado*, the Court discusses Bushay's claimed possessory interest in the firearm.

AO 72A
(Rev.8/8
2)

to property seized from a location in which he has no legitimate expectation of privacy; in *Soldal*, the plaintiffs were literally dispossessed from their property. Similarly, footnote 11 in *Rakas* affords no support to Bushay, because the Court has not been directed to any cases, and has found none, where a court permitted someone like Bushay - - at most a casual visitor - - to invoke the Fourth Amendment to challenge the seizure of his own property when the visitor was not present at the time of the search and seizure. *See, e.g., United States v. Sosa*, No. CRIM.A. 05-44-1, 2005 WL 3303869, at *3 (E.D. Pa. Dec.2, 2005) (no expectation of privacy in duffle bag left in mother's home since defendant's residence was elsewhere, he was at most a casual visitor, and he did not testify that he left bag in mother's home for safekeeping). *Compare United States v. Waller*, 426 F.3d 838, 842-45 (6th Cir. 2005) (defendant had standing where he had permission from friend to store personal belongings at friend's apartment, which included firearms in luggage bag stored in friend's bedroom closet, friend did not have authority to consent to search because friend and defendant had a mutual understanding that luggage contained defendant's private personal effects and defendant had "shown by his conduct" that he wished to preserve the contents of a locked suitcase). As a

AO 72A
(Rev.8/8
2)

result, the Court rejects Bushay's argument that the authorities he relies upon afford him standing to challenge the seizure of the firearm.[20]

Even if a bare possessory interest allowed Bushay to challenge the seizure of the firearm, the Court concludes that no possessory interest of Bushay's in the firearm has been established. Summarizing the evidence as to the firearm, Bushay told McConaughey that he had a gun and that it was in the night stand at the hotel, T22; he left it there, T33; Scarlett acknowledged that there was a firearm in the night stand between the beds and that he had touched it and was going to call "Jerome" and ask him why he left it there, T54, or he called and did not get an answer. T76.

---

[20] The Court also has considered *sua sponte* whether the Supreme Court's decision in *United States v. Jones*, --- S. Ct. ----, 2012 WL 171117 (Jan. 23, 2012), mandates a different conclusion. It does not, for that case affirmed that *Katz* "did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.' " *Id.*, --- S. Ct. at ----, 2012 WL 171117, at *4 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring)). As such, *Jones* does not establish, or confirm the existence of, a constitutional possessory right altogether removed from a constitutional privacy right, because both rights are implicated only if the government intrudes on a constitutionally protected *area*. For example, Bushay's argument perhaps would be stronger if the firearm at issue was located in his valise in Scarlett's hotel room, for the valise might qualify as a constitutionally protected area. The night stand drawer in the hotel room of a third party does not constitute a constitutionally protect area in this case.

28

From these facts, the Court concludes that Bushay has proven neither a subjective nor objective interference with his possessory rights to the firearm sufficient to allow him to challenge the warrantless seizure of the firearm. First, Bushay did not possess the firearm when it was seized. He left it unsecured in a hotel room in which he had no cognizable legitimate expectation of privacy. Second, the firearm was not registered in his name. Third, he left what he refers to as an expensive item in the night stand of a hotel room for which he neither paid nor was a registered guest. *Compare King*, 509 F.3d at 1341 (defendant exhibited subjective expectation of privacy by taking affirmative steps to install security settings on computer); *cf. Robinson*, 62 F.3d at 1329 (defendant had no subjective expectation of privacy where he took no affirmative steps to prevent heat from an indoor marijuana cultivation operation from venting into atmosphere above his residence). Fourth, he left it not in a case or in a personal belonging such as a coat or a valise, but in the drawer of a night stand in a hotel room that was not his. (As such, this case is distinguishable from *Delgado*, where the challenging defendant stored personal papers in his own shirt.) Fifth, he did not tell Scarlett, who had rented the room, that the gun was left in the night stand. As such, he risked Scarlett's early departure from the room or access to the room by third parties such as housekeeping or maintenance. Sixth, he did not prove that the keys removed

29

from him at the time of the arrest were the keys to room 308 of the Fairfield Inn. Therefore, he had no way of retrieving this supposedly valuable piece of property except through the good graces of Scarlett, who, according to the uncontradicted evidence, was unaware initially that the firearm was left in the room, and, at best, was unable to contact Bushay about it. As such, he made no efforts to secure the property from access by strangers. *See United States v. Espinosa–Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) ("A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy.").

Moreover, even the commentator relied upon by the *Delgado* Court noted that "[a]ssessment of [a] defendant's privacy expectation vis-a-vis the item may also be aided by considering if he dealt with that item in a fashion which reflects an effort on his part to maintain privacy." 6 W. LaFave, Search and Seizure, § 11.3(d) (4th ed. 2004), at 184. Bushay did not take steps to maintain his privacy or possession of the firearm by leaving it in the night stand of a hotel room in which he had no more than a fleeting interest.

As a result, the undersigned concludes that Bushay does not have standing to challenge the seizure of the firearm.

AO 72A
(Rev.8/8
2)

### 2. Seizure of the firearm

In the event that the District Court concludes that the undersigned is wrong in concluding that Bushay lacks standing to challenge the search of room 308 or seizure of the firearm, the Court addresses the propriety of the warrantless search and seizure.

### a. Contentions of the Parties

The government asserts that the firearm was properly seized because the third parties in the room, Scarlett and Chadwick Williams, voluntarily consented. [Doc. 465 at 14-16].[21]  Bushay responds that the written consent was not valid because Marolda could not state whether it was signed before or after he searched for and seized the firearm. [Doc. 468 at 14]. He also argues that any oral consent was not valid because Marolda gave no details about how he obtained the consent. [Id. at 15-17].

---

[21]     The government faults Bushay for not addressing the propriety of consent in his opening brief, thus depriving them of an opportunity to respond to his arguments [Doc. 465 at 14 n.3]. However, Bushay was only directed to address standing and his statements in his brief. T86. This is because the government, and not a defendant, bears the burden of establishing that a warrantless search and seizure were reasonable based upon a recognized exception to the warrant requirement. *United States v. Bachner*, 706 F.2d 1121, 1125-26 (11th Cir. 1983). In his opening brief, Bushay did not have to speculate on what grounds the government might raise to justify the search and seizure. Thus, he did not have to address this issue in his opening brief.

AO 72A
(Rev.8/8
2)

## b.    Applicable Law

A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant. *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality-of-circumstances inquiry). Further, " '[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550

32

(1968)); *see also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ( " 'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the consenting person's custodial status, the presence of coercive police procedures, the extent and level of the subject's cooperation with police, the subject's awareness of his right to refuse to consent to the search, his education and intelligence, and, significantly, his belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798-99. However, the failure to advise one asked to consent that he has a right to refuse to consent will not invalidate an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

A search is permissible if an officer obtains the voluntary consent of either the person whose property is searched or of a third party who possesses common authority over the premises. *United States v. Bone*, 433 Fed. Appx. 831, 833 (11th Cir. July 11, 2011) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)). "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. Common authority is based upon mutual use of property by persons generally

AO 72A
(Rev.8/8
2)

having joint access or control." *United States v. Aghedo*, 159 F.3d 308, 310 (11th Cir. 1998) (citation omitted). As noted by the Supreme Court, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v. Matlock*, 415 U.S. 164, 171-72 n.7 (1974). Furthermore, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." *United States v. Fernandez*, 58 F.3d 593, 597 (11th Cir. 1995); *see also Brazel*, 102 F.3d at 1148. "As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). It is the government's burden to establish that Scarlett and Chadwick Williams had authority to consent to the search of room 308, *Rodriguez*, 497 U.S. at 181, and that they voluntarily consented.

34

### c.    Analysis

The Court concludes that, while the record contains more than enough evidence that Scarlett was authorized to consent to a search of the hotel room for the firearm, the government did not prove that Scarlett (or Williams) voluntarily consented to a search of the room.  Marolda testified that he had voluntary consent, yet he did not testify as to the "form of words, gesture or conduct" that would allow the Court to conclude that either of the occupants of room 308 voluntarily consented.  *See Bumper*, 391 U.S. at 548-50; *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (holding that consent to search "may be in the form of words, gesture or conduct") (citing *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)); *see also United States v. Williams*, 650 F. Supp. 2d 633, 672 (W.D. Ky. 2009) (finding that officer's conclusory testimony about consent insufficient to carry government's burden); *United States v. Wing*, No. A05-042 CR (JWS), 2005 WL 1410844, at *8 (D. Alaska) (R&R) (same).

This lack of detail about what was asked of Scarlett or Williams about consenting, or how they responded, is compounded by the fact that the only evidence about what either of the room occupants was told about the police presence was that they "were there to search the room to look for a firearm in the room."  T49.  As such, the subsequent warrantless search ran afoul of *Bumper*'s dictate that voluntary consent

35

requires more than mere acquiescence to lawful authority. *Bumper*, 391 U.S. at 548-49. The Court therefore concludes that the government has not proven that the occupants of room 308 voluntarily consented to a search of the room.

Nor did the government prove voluntary consent due to Scarlett and Williams's execution of the written consent-to-search form. To his credit, Marolda testified that he could not recall whether the written consent forms were executed before or after the search had been conducted. Under such circumstances, then, an after-the-fact written consent is akin to a mere submission to official authority rather than a voluntary consent. Although a post-search consent to search may constitute ratification of the search, *see generally United States v. Reeh*, 780 F.2d 1541, 1547 (11th Cir. 1986), the record in this case does not support a conclusion that Scarlett and Williams voluntarily consented and then ratified their consent by signing the consent-to-search form.

That does not end the Court's analysis, however, because despite the failure of the government to prove voluntary consent, the seizure of the weapon was otherwise reasonable under the Fourth Amendment.

"[R]easonableness is still the ultimate standard" under the Fourth Amendment. *Camara v. Mun. Court of City and Cnty. of San Francisco*, 387 U.S. 523, 539 (1967). Viewed objectively, *see Horton v. California,* 496 U.S. 128, 138 (1990) (noting that

36

"evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"), the firearm was properly seized under the exigent-circumstances exception to the warrant requirement.

In *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007), the defendant was suspected of having shot his wife and child. Police traced him to a hotel room registered in another person's name. They surrounded the room, and when Newsome came out, he was arrested. An officer asked him whether there was anyone or anything in the room that he should know about. Newsome told the officer he had a gun, indicating towards the night stand. When the officer did not see the weapon, he asked Newsome where it was, and Newsome directed him to a black bag where the pistol was located. *Id.* at 1222-23. Newsome was charged federally with being a felon-in-possession, and before trial moved to suppress the firearm on Fourth and Fifth Amendment grounds. On appeal from his conviction, the Eleventh Circuit affirmed, rejecting Newsome's Fourth and Fifth Amendment challenges. Relevant to the present case is the *Newsome* Court's rejection of the Fourth Amendment attack by applying an exigent-circumstances rationale to support the warrantless search:

> [T]he Supreme Court has "long recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context." [*New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984)]. *Quarles* holds that the warrantless seizure of a gun is "objectively reasonable" under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large. *Id.* (citations omitted); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989).

*Newsome*, 475 F.3d at 1226. The *Newsome* Court found exigent circumstances warranted the seizure of the firearm because the officers

> had reason to believe that Newsome was with another person and "[i]t was not unreasonable for the officers to fear leaving a loaded gun, likely evidence of a crime (the alleged shooting of his wife and child), unattended in a motel room. Nor was it unlikely that a friend, possibly [the person in whose name the room was registered], would return to the room and remove the gun. We have held that officers can seize evidence where there is a fear that it might disappear or be destroyed." *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983), [ ] ("The exigent circumstances exception to the fourth amendment warrant requirement applies in 'those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.' " (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759[ ] (1979))). The exigent circumstances exception to the Fourth Amendment permitted locating and securing the weapon, making the seizure and subsequent admission of the gun proper.

*Newsome*, 475 F.3d at 1226-27.

In this case, it was reasonable for the agents to seize the firearm under the exigent-circumstances exception. "A warrantless search is allowed . . . where both

AO 72A
(Rev.8/8
2)

probable cause and exigent circumstances exist." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991). First, the agents had probable cause to believe that the firearm was in the night stand of room 308 because both Bushay and Scarlett told them it was there. In addition, there were exigent circumstances. "Recognized situations in which exigent circumstances exist include: 'danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect.' " *United States v. Reid*, 69 F.3d 1109, 1113 (11th Cir. 1995). As one court has recognized:

> Exigent circumstances may permit a warrantless search of a home under the "public safety" exception, which permits an officer to search for or seize a dangerous weapon or instrumentality based on the officer's legitimate concern for the safety of the public or themselves. *United States v. Janis*, 387 F.3d 682 (8th Cir. 2004) (holding that concern for safety of others allowed police to enter residence, where they discovered firearms in plain view); *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (noting that a legitimate concern for safety of law enforcement officers or others constitutes exigent circumstances); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989) (holding that search for firearm was permissible where officers witnessed defendant in possession of firearm and planned to leave children unattended in the home); . . . *Warden v. Hayden*, 387 U.S. 294, 298-299 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").

AO 72A
(Rev.8/8
2)

*United States v. Lawrence*,  No. CRIM. 05-333(MJD/RLE), 2006 WL 752920, at *1 (D. Minn. Mar. 26, 2006).

Based on *Newsome* and *Lawrence*, the Court agrees that the firearm presented a danger to the public that the agents were authorized to mitigate by seizing the weapon.  The agents were aware that Bushay had been indicted for a drug crime in Atlanta, and that he was arrested and in custody in Tampa pending removal to this District.  Bushay claimed to have left the gun in the hotel night stand, which was confirmed by Scarlett.  Scarlett's reaction to Marolda was such that a reasonable officer would conclude that Scarlett was attempting to distance himself from the firearm when he stated that he had called, or was going to call, Bushay to determine why Bushay had left the firearm in the hotel night stand.  As a result, there was no one present who claimed the firearm or who could provide for its safekeeping.  It would have been unreasonable for the agents to have simply left the firearm in the night stand where it could pose significant danger to hotel employees or future guests of room 308.  As a result, the firearm was properly seized, even if Bushay has standing to challenge its warrantless seizure.

40

In conclusion, the Court **RECOMMENDS** that Bushay's motion to suppress the firearm be **DENIED** because he does not have standing to challenge its search or seizure.[22]

### 3. Statements

#### a.    Contentions of the parties

Bushay argues that his statements were unlawfully obtained because the government failed to obtain a written waiver of his *Miranda* rights and failed to prove

---

[22]    The government also argues that public policy warrants favors denial of the motion to suppress because if the officers had delayed their search and seizure of the weapon there could have been serious consequences for the safety of the community. [Doc. 465 at 19]. This argument is a variation on the exigent-circumstances discussion adopted by the Court, although the government never raised the exigent circumstances doctrine expressly. Instead, it argues that the costs of leaving the weapon outweighed the benefits of suppressing the firearm from Bushay's trial. In support it argues that at least one individual knew the weapon was there and had handled it. It then argues that since hotel rooms are temporary, the weapon could not simply have been left there. Finally the government argues that suppressing the evidence in this case would deter officers in the future from seizing known weapons in the most timely and efficient manner to safeguard the community. [*Id.*].

Having recommended that the motion to suppress be denied, the Court does not need to discuss these arguments in detail. However, given the obvious exigent circumstances, the Court is unsure why the government chose to invoke a general cost-benefit exception to the exclusionary rule without citing to a single Supreme Court or Eleventh Circuit case supporting such an argument. Further, the deficiency in the government's showing on Scarlett's consent-to-search could likely have been remedied by more detailed questioning.

AO 72A
(Rev.8/8
2)

that they were obtained freely and voluntarily. He argues that any waiver was involuntary given the violence of his arrest and his being whisked away to the unfamiliar confines of the DEA office. [Id. at 14]. The government responds that the requirements of *Miranda* were satisfied and that Bushay's subsequent invocation of his right to stop the questioning when it became more pointed demonstrated his understanding of his rights. [Doc. 465 at 17-18]. The government also contends that his statements were voluntary. [Id. at 18]. In response, Bushay merely relies upon his motion and opening brief. [Doc. 468 at 18].

### b. Applicable Law

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475.

Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly

42

waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).[23]  The

government must prove by a preponderance of the evidence that the defendant waived

his rights knowingly and voluntarily.  *Berghuis v. Thompkins*, --- U.S. ----, ----,

130 S. Ct. 2250, 2261 (2010);   *United States v. Glover*, 431 F.3d 744, 748 (11th Cir.

2005).  Also, the government "does not need to show that a waiver of *Miranda* rights

---

[23]     The Supreme Court in *Miranda* held that in order fully to apprise a person
interrogated of the extent of his rights,

> it is necessary to warn him not only that he has the right to consult with
> an attorney, but also that if he is indigent a lawyer will be appointed to
> represent him.  Without this additional warning, the admonition of the
> right to consult with counsel would often be understood as meaning only
> that he can consult with a lawyer if he has one or has the funds to obtain
> one.  The warning of a right to counsel would be hollow if not couched in
> terms that would convey to the indigent - - the person most often
> subjected to interrogation - - the knowledge that he too has a right to have
> counsel present.  As with the warnings of the right to remain silent and of
> the general right to counsel, only by effective and express explanation to
> the indigent of this right can there be assurance that he was truly in a
> position to exercise it.

*Miranda*, 384 U.S. at 473 (footnotes omitted)

The Supreme Court has held that *Miranda* warnings that convey the substance
of the suspect's rights are sufficient. *See Duckworth v. Eagan,* 492 U.S. 195, 210-15
(1989); *see also California v. Prysock*, 453 U.S. 355, 359 (1981).  However, the advice
given the suspect cannot contradict the warnings required by *Miranda*.  *United States
v. Lall*, 607 F.3d 1277, 1283-84 (11th Cir. 2010); *Hart v. Attorney Gen. of Florida*,
323 F.3d 884, 894 (11th Cir. 2003).

43

was express," and "an implicit waiver" of the *Miranda* rights is sufficient. *Thompkins*, 130 S. Ct. at 2261; *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010).

An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion, or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Wright*, 300 Fed. Appx. 627, 630 (11th Cir. Nov. 12, 2008) (citing *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995)). A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *Id.*

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted). The Court must consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a

44

defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Gonzalez*, 71 F.3d at 828. However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). In addition, in any arrest there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the statements. *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (discussing consent to search following arrest).

45

### c.     Analysis

The Court concludes that the government established that Bushay's statements were obtained in compliance with *Miranda* and were otherwise voluntary.

First, as to compliance with *Miranda*, McConaughey read Bushay his *Miranda* rights from a DEA Form 13A, so Bushay was made aware of his rights.  In response to McConaughey's question as to whether he was willing to answer questions, Bushay responded that he was willing to talk to him.   In addition, the record is clear that that Bushay did not waive his rights and agree to answer questions due to any police coercion, deception, or intimidation.  Although he argues that the circumstances of his arrest constituted coercive and intimidating conduct, the mere fact that he was arrested does not prevent a voluntary relinquishment of his *Miranda* rights, since the *Miranda* decision presupposes a defendant's custodial status, *United States v. Gay*, 774 F.2d 368, 379 & n.18 (10th Cir. 1985) (recognizing that as "a general rule, the *Miranda* warnings presuppose the satisfaction of two conditions - - custody and interrogation" and the "essence of *Miranda* is that when these two conditions coexist (custody & interrogation), the environment the suspect is kept in is inherently coercive. *Miranda* is thus intended as a safeguard in counteracting the coercive environment."); and there was nothing unduly violent or coercive about the manner of Bushay's arrest

that would make his waiver a short time later involuntary. *See* T15-16 (describing Bushay's arrest).

Second, the Court reaches the same conclusion as to the voluntariness of Bushay's statements. The questioning began shortly after Bushay's arrival at the DEA offices. He was not promised any benefit nor was he otherwise threatened. The questioning by McConaughey and then by Gordon was not prolonged. It is significant that Bushay exercised his right to stop answering questions after McConaughey began questioning him about his Atlanta activities (following Bushay's converstion with Gordon), as that action demonstrates that Bushay recognized that he had a choice whether to answer any questions.

As a result, the undersigned **RECOMMENDS** that Bushay's motions to suppress evidence and statements related to his arrest and the search of the hotel room, [Docs. 155, 156, 280], be **DENIED**.

## II.     *Motion to suppress search and seizure re: traffic stop, [Doc. 282]:*

At the evidentiary hearing, the government announced that it was not going to introduce in its case-in-chief any evidence from an October 4, 2010, traffic stop in Lamar County, Ga. T5-9.

AO 72A
(Rev.8/8
2)

Accordingly, the undersigned **RECOMMENDS** that the motion to suppress regarding the traffic stop, [Doc. 282], be **GRANTED AS MOOT**.

### III. *Motions to suppress searches of 943 Peachtree Street, Apt. 707, [Docs. 278, 326], and 6746 Grey Rock Way, [Docs. 279, 327]*

In these motions, Bushay seeks to suppress evidence seized as a result of the execution of two federal search warrants on December 15, 2010, at two locations.

### A. 943 Peachtree Street, Apartment 707, Atlanta, Ga.

### 1. Facts

On December 15, 2010, Gordon applied for a federal search warrant from Magistrate Judge Brill to search the above-described target address. [Doc. 326-1 (application and affidavit for search warrant, case number 1:10-MJ-1911-GGB (N.D. Ga. Dec. 15, 2010)) ]. In his attached affidavit, Gordon averred that in addition to his experience as a local police officer in Georgia, including as of that time 6 years as a local narcotics detective, he had been a DEA TFO since 1996. [*Id.* at 2]. Gordon stated that he had participated in hundreds of narcotics investigations, including those involving money laundering, and had been involved in numerous investigations where Title III court-approved electronic surveillance was used. [*Id.*]. He further related that through his training and experience, discussions with other law-enforcement officers

48

and debriefings of cooperating defendants, cooperating sources, and other witnesses, he was familiar with the methods of operation typically used by drug traffickers, including the types and amounts of profits they make, their methods, language, and terms used to disguise the source and nature of their drug dealings, and the methods they use to thwart detection, arrest, and lawful proof of their activities, including the use of nominees to hold title to property and assets. [*Id.* 2-3; *see also id.* at 3-5 (detailing drug-trafficking practices); 11 n.5 (use of nominees)].

Gordon continued that the target premises was a nearly 700-square-foot three-room condominium in the Metropolis condominium building in Atlanta, which has a 24-hour on-duty concierge, limited-access elevators, and private parking, and is accessible only via key card or access codes. [*Id.* at 3 & n.1].

Gordon also stated that various consensual and court-authorized intercepted telephone calls were recorded and that many of the calls were in Jamaican Patois[24], and that the calls were monitored by Jamaican Patois-speaking monitors and agents. [*Id.* at 6]. He then related that federal law enforcement was investigating an Atlanta-based drug-trafficking organization, and that a confidential source (CS-1) had

---

[24]     The affidavit stated that Jamaican Patois is an English-African Creole language principally spoken in Jamaica or communities with strong ties to Jamaica. [Doc. 326 at 7 n3].

49

AO 72A
(Rev.8/8
2)

provided information on Devon Samuels, a Customs and Border Protection (CBP) officer at the Atlanta airport who used his law-enforcement position to smuggle aliens into the United States and assist drug traffickers. CS-1 stated that Samuels was paid between $400-$5000 per trip to transport drug proceeds in the United States and Jamaica, using his credentials and position to avoid detection and suspicion. CS-1 further related that due to his position, Samuels had access to the Treasury Enforcement Communications System (TECS), which identifies targets/subjects of Immigration and Customs Enforcement investigations, and that Samuels performed TECs searches on himself and his associates. Gordon averred that a review of Samuels's TECS searches reflected that he searched TECS for himself, Bushay, and Mark Tomlinson. [*Id.* at 8-9].

Gordon also advised that Samuels was the target of three sting operations involving the transportation of currency and firearms through the Atlanta airport. On November 3, 2010, an undercover officer posing as a drug dealer gave Samuels $22,000 in purported drug proceeds. With Tomlinson's assistance, and by using his badge to avoid security screening, Samuels smuggled the money to Jamaica, where it was delivered to a Jamaican undercover agent posing as a drug trafficker. On November 19, 2010, Samuels and his wife (who worked for Delta Airlines) smuggled $50,000 in supposed drug proceeds to Jamaica, turning them over to undercover

50

Jamaican police officers. Finally, on November 30, 2010, Samuels smuggled $20,000 in purported drug money and 5 guns he received from an undercover police officer into the Atlanta airport and turned them over to another undercover officer who claimed he was going to a meeting with Mexican drug traffickers in Arizona. [*Id.* at 8].

Gordon then stated that the investigation led agents to identify Bushay and Otis LNU as leaders of an MDMA and marijuana distribution investigation who used various distributors, brokers and couriers, including Tomlinson, Damian Aarons, Curtis Hernandez, Christopher Dixon, Ricardo Duncan and Roshaun Hood, to facilitate their operations. In April 2010, they intercepted a series of calls where Tomlinson was discussing the return of low-grade marijuana, which resulted in the seizure of $101,000 in currency found following a traffic stop. [*Id.* at 9]. Later in April and in May, intercepted telephone calls of Dixon led to the search of three packages of marijuana which had been mailed, resulting in the seizure of 45 pounds of marijuana. Later in May 2010, Dixon sold 3000 MDMA pills to a confidential source. [*Id.* at 9-10].

In June, intercepted phone calls revealed that Dixon ordered 5000 MDMA pills from Dixon, who ordered them from Bushay. Dixon and Duncan were later stopped in a stolen car and 4000 MDMA pills and a handgun were seized. Then, on October 1, 2010, a search warrant was executed at a location believed to be occupied or controlled

AO 72A
(Rev.8/8
2)

by Otis, and 700,000 MDMA pills (hidden in various locations including the wall insulation), 25 pounds of marijuana, $39,000 and one stolen firearm were recovered. [*Id.* at 10].

The affidavit continued that on October 4, 2010, Bushay and others were stopped for an observed traffic violation while driving from Atlanta to Florida, and Bushay provided the target address as his residence, and he registered that address with the Georgia driver's-license authorities. Also, in August 2010, Bushay was intercepted telling Christopher Williams (referred to as "Washington") to meet him at that location, referred to as "the condo." [*Id.* at 11]. On August 11, 2010, Bushay's phone call with Washington was intercepted, in which Bushay asked Washington if he was planning on using the condo that weekend, and when Washington replied that he was not, Bushay told him that was good because "I have paper and something in there . . . and a stash there that I want to show you." [*Id.*]. Gordon believed that "paper" and "something" were code for drug proceeds and controlled substances. [*Id.*]. On the same day, intercepted calls led agents to believe that Bushay was headed to the condo to meet Hood, and cell-site data reflected that Bushay was in the vicinity of the condo. On the same date in another intercepted conversation, this time with an individual named "Sugar," who law enforcement also believed was involved in the drug trade,

52

Bushay acknowledged (albeit in code) that it was his condo, that drug proceeds were stored there, and that he was going to install a safe. [*Id.* at 12-13].

Then, on August 14, 2010, Bushay and Washington were intercepted discussing what the agents interpreted as meaning that there were drugs stored there in the safe. [*Id.* at 13]. On September 27, 2010, Bushay and Washington were intercepted discussing what the agents believed was Bushay asking whether drugs or proceeds were put away ("is everything put up") because Bushay was planning on bringing a female to the condo. [*Id.*].

Gordon then related that on October 6, 2010, in an intercepted telephone call, Bushay asked Washington, "did you leave anything in the room . . . the thing that I saw you counting?", which agents believed was a reference to counting drug proceeds. At the time of the conversation, Bushay was in the lobby of the condo while cell-site data indicated that Washington was nearby or at the condo. [*Id.* at 14].

In a call between Bushay and Hood intercepted on November 18, 2010, Bushay asked Hood whether he wanted any "keisha" (code for marijuana). After Hood asked about price, Bushay stated he was getting it "for 45" ($450 per pound) and could sell it "for 5" ($500 per pound). Visual surveillance showed Hood walking into the lobby of the condo building, and Hood was observed not carrying anything. Bushay was

53

intercepted telling Hood to advise the person at the front desk to let him come up to the seventh floor, and they confirmed that he would go to the condo unit. Forty minutes later, Hood was observed leaving carrying a red bag, which led agents to believe that he had just bought marijuana. [*Id.* at 14-15].

### 2. Bushay's contentions

Bushay first contends that the warrant was not supported by probable cause. In support, he argues that paragraphs 8 through 11 of the affidavit either did not pertain to Bushay at all, contained unsupported conclusions, or did not pertain to the condo. [Doc. 326 at 3].

Next, as to paragraphs 12 through 20, he first claims that the reference in ¶ 18 about "is everything put up" being inferred to hiding contraband or currency is an unsupported inference. He then argues that the October 6 conversation referenced in ¶ 16, which showed that no money was in the condo, does not support the existence of probable cause for December 15, 2010. [*Id.* at 4]. He then argues that the conclusion that Bushay sold marijuana to Hood on November 18, 2010, is speculative, since there was no stop or seizure of any marijuana from Hood. [*Id.*].

He next argues that the information was stale because the affidavit at best showed drugs or money at the location in August, over four months before the search

warrant was issued. [*Id.* at 5]. He also argues that there was too little information in paragraphs 12 through 20 to establish that contraband or evidence would be located in the residence. He also contends that Gordon's interpolations of telephone calls are insufficient to support a finding of probable cause as to the residence. [*Id.* at 6-7].

### 3.    Legal Standards

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The burden of establishing that the warrants in this case were defective is upon the defendant. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).

Probable cause to support the issuance of a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept - - turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and

'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000). To avoid "rigid" legal rules, *Gates* changed the "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 114 (1964), into a totality-of-the-circumstances test. *See Gates*, 462 U.S. at 230-35. Under the *Gates* totality-of-the-circumstances test, the "veracity" and "basis of knowledge" prongs of *Aguilar* for assessing the usefulness of an informant's tips are not independent. Rather, "they are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]" *Gates*, 462 U.S. at 233. That is, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citing *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law-enforcement agent-affiant, *Robinson*, 62 F.3d at 1331 n.9, since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United*

56

*States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)).

To satisfy the probable-cause standard, the government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994); *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985). Thus, for probable cause to exist, the information supporting the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant. *Sgro v. United States*, 287 U.S. 206, 210 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."); *Domme*, 753 F.2d at 953; *United States v. Bascaro*, 742 F.2d 1335, 1345 (11th Cir. 1984). Warrant applications based upon stale information generally fail to establish probable cause that similar or other improper conduct is continuing. *Harris*, *id.*; *Bascaro*, 742 F.2d at 1345.

The Eleventh Circuit has framed as follows the issue of staleness:

> When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented. *Bascaro*, 742 F.2d at 1345; *Domme*, 753 F.2d at 953; *Sgro*, 287 U.S. at 210. In this case-by-case determination we may

57

consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched. *See United States v. Hooshmand*, 931 F.2d 725, 735-36 (11th Cir. 1991); *Bascaro*, 742 F.2d at 1345; *Cauchon v. United States*, 824 F.2d 908, 911 (11th Cir. 1987); *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992); *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1992); and *United States v. Rugh*, 968 F.2d 750, 754 (8th Cir. 1992). Ultimately, however, even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material. *See Bascaro*, 742 F.2d at 1346 (additional circumstantial evidence coupled with defendant's preexisting involvement with conspiracy supported probable cause determination). *See also Bucuvalas*, 970 F.2d at 940.

*Harris*, *id.* Thus, "[i]n general, the basic criterion as to the duration of probable cause is the inherent nature of the crime." *United States v. Haimowitz*, 706 F.2d 1549, 1555 (11th Cir. 1983) (internal quotation marks and citation omitted). "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Bascaro*, 742 F.2d at 1345-46 (quoting *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973)); *see also United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000) ("When criminal activity is protracted and continuous, it is more likely

AO 72A
(Rev.8/8
2)

that the passage of time will not dissipate probable cause." (quoting *Domme*, 753 F.2d at 953)).

Further, an affidavit in support of a search warrant for a suspect's residence "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). Thus, where a warrant to search a residence is sought, the affidavit must supply the authorizing magistrate judge with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a "safe yet accessible place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999)). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982). With regard to a suspect's home, the *Kapordelis* Court reiterated that:

> "[t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."

AO 72A
(Rev.8/8
2)

*Kapordelis*, 569 F.3d at 1310 (quoting *United States v. Green*, 634 F.2d 222, 226

(5th Cir. Unit B Jan. 1981)).  The *Kapordelis* Court continued:

> There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  [ ] *Martin*, 297 F.3d [at] 1314 [ ]; *see United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in residence will support search); *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus between items to be seized and defendant's home can be established circumstantially where contraband is capable of being hidden in residence).  *But see Green*, 634 F.2d at 226 (convenience of defendant's residence "for use as a place to plan and hide fruits of the crime [was] thus diminished, if not eliminated" where alleged obstruction of justice, suborning of perjury, and violations of citizen's civil rights took place thousands of miles from home in absence of other evidence linking residence and the criminal activity).

*Kapordelis*, 569 F.3d at 1310.

Then, the task of a reviewing court is not to conduct a *de novo* determination of

probable cause, but only to determine whether there is substantial evidence in the

record supporting the magistrate judge's decision to issue the warrant, *Massachusetts*

*v. Upton*, 466 U.S. 727, 728 (1984).  The reviewing court "should not interpret

supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense

approach should be employed so as to encourage recourse to the warrant process and

AO 72A
(Rev.8/8
2)

to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir.1994); *see also Robinson*, 62 F.3d at 1331 (requiring reviewer to afford "great deference to judicial determination of probable cause to issue a search warrant") (citing *Gonzalez*, 940 F.2d at 1419).

### 4. Analysis

The Court concludes that Bushay's arguments about the deficiencies of the 943 Peachtree Street condo should be rejected. First, the information was not stale, in that it showed a consistent pattern of using the location to store drug proceeds or contraband, culminating in a purchase of marijuana at the location less than a month before the warrant was sought. As the Eleventh Circuit has indicated, where the conduct in the affidavit "recites activity indicating protracted or continuous conduct, time is of less significance." *Bervaldi*, 226 F.3d at 1265 (internal quotation marks omitted). "Protracted and continuous activity is inherent in large-scale drug trafficking operations." *Bascaro*, 742 F.2d at 1346. Here, there is evidence that from at least June 2010, Bushay was involved in the distribution of large quantities of MDMA and marijuana and that these transactions were facilitated at the condo. [Doc. 326-1 at ¶ 11(d) (June deal involving 5000 MDMA pills); *id.* ¶ 14 (August 11 discussion about

"paper" and "stash" at the condo); *id.* ¶ 16 (August 11 conversation where Bushay states that he has "paper" and is installing a safe at the condo); *id.* ¶ 17 (August 14 conversation between Bushay and Washington in which Bushay asked Washington "How is the condo? Do you have anything in the condo?", to which Washington replied, "I got the thing." Bushay then stated, "It is in there," and Washington replied, "Yes, it is clean and nice, everything good."), which reasonably could be interpreted as indicating that drugs were stored in the condo safe; ¶ 19 (October 6 conversation about counting proceeds in the condo); ¶ 20 (November 18 conversation between Bushay and Hood about purchasing marijuana from condo, and subsequent call during consummation of that transaction).

Second, the affidavit established probable cause to believe that Bushay was trafficking in drugs. The CS's information that Samuels was violating the law and his oath of office, including his improper use of the TECS computer, was corroborated by the undercover transactions and verification of his misuse of TECS by querying Bushay. Moreover, Bushay's telephone conversations, during which he used cryptic language reasonably interpreted by the experienced law-enforcement agent-affiant as pertaining to an ongoing drug trafficking, established that he was using the condo to facilitate his drug trafficking. Bushay asks the Court to interpret the affidavit in a

hypertechnical manner, evaluating each fact in isolation, but the Court's task is otherwise. The Supreme Court, in fact, has warned lower courts of the error of "not consider[ing an officer's] affidavit in its entirety" and "judging bits and pieces of information in isolation ." *Upton*, 466 U.S. at 732. In addition, the issuing judge was authorized to issue the warrant based on the affiant's reasonable interpretation of the intercepted telephone calls. *United States v. v. Garcia*, 447 F.3d 1327, 1335 (11th Cir. 2006); *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *48 (N.D. Ga. Sept. 27, 2007) (concluding that in determining existence of probable cause to issue warrant, Magistrate Judge properly relied on affiant's interpretation of seemingly innocuous words and conversations intercepted over wire intercepts). The same rationale applies to defeat Bushay's argument about the lack of corroboration of Gordon's conclusion that Hood purchased marijuana from Bushay on November 18. Also, the issuing judge could rely on Gordon's statement in the affidavit of his familiarity with drug traffickers' practices as a result of his training and experience, including commonly keeps records and proceeds of their illicit activities in private and secure locations such as their residences. [*See* Doc. 326-1 at 3-5].

Finally, there was a sufficient nexus between Bushay, his criminal activity, and the condo. The affidavit sets forth multiple events demonstrating that Bushay was

63

using the condo to facilitate his drug dealing, and the issuing Magistrate Judge was authorized to conclude that there was probable cause to believe that evidence of Bushay and others' drug crimes would be located at the condo.

As a result, the undersigned **RECOMMENDS** that Bushay's motion to suppress evidence at 943 Peachtree Street, Unit 707, [Docs. 278, 326], be **DENIED** without an evidentiary hearing.

### B.     6746 Grey Rock Way, Lithonia, GA

### 1.     Facts

On December 15, 2010, Gordon applied for a federal search warrant from Magistrate Judge Brill to search the above-described target address. No. 1:10-MJ-1905-GGB (N.D. Ga. Dec. 15, 2010). [Doc. 327-1]. The affidavit contained the same preamble as to Gordon's training and experience, drug-trafficking practices, and information relating to Samuels and others in paragraphs 8 through 10, as contained in the condo search-warrant application. [*See id.* at 1-5].

In addition, on April 9, 2010, Tomlinson was observed arriving at the Grey Rock location in a vehicle registered to Samuels. A short time later, a vehicle registered to Aarons arrived at the location, and stayed for 15 minutes. After the Aarons vehicle left, Tomlinson was intercepted calling Hargreaves, and Tomlinson told her to meet him at

the location.  The context of the conversation indicated that Hargreaves and Tomlinson had previously met at Grey Rock.  Hargreaves was seen arriving at the location and meeting with Tomlinson, although the surveilling agents could not tell if Tomlinson gave anything to Hargreaves.  Shortly after this meeting, Hargreaves' vehicle was stopped, resulting in the seizure of over $101,000.  [*Id.* at 10].

On October 5, 2010, following the 153 kilograms of MDMA seizure from Otis on October 1, Bushay and Tomlinson were intercepted.  Tomlinson stated that "the whole situation makes me nervous" and Bushay stated that "I need to take out those things over by me."  In a later call, Bushay told Tomlinson to "go over to my place and take everything out."  Tomlinson updated Bushay on his status of arriving at Grey Rock. [*Id.* at 11].  A subsequent phone call indicated that Bushay's girlfriend (who was using the location as her residence) was at Grey Rock.  [*Id.*].

Geo-location data further indicated that Tomlinson was near the Grey Rock residence when he told Bushay that there was a van in the garage, with Bushay directing Tomlinson to "to use the van in the garage to take the product and it will be easier to move, transport the product."  Bushay also told Tomlinson to "place the product in the van by taking off the top a halfway and place the product in there and place the top back down, everything should fit." [*Id.* at 11-12].  Gordon interpreted

these calls to mean that while Tomlinson was at Grey Rock, Bushay was directing him to place the narcotics in a hidden compartment in the van. Gordon represented that using hidden compartments in vehicles was a routine practice of drug traffickers. [*Id.* at 12].

On November 22, 2010, Bushay was intercepted speaking with his brother (Roger Yee), who told Bushay that he had a firearm that he took from underneath the bed. Bushay instructed Yee to give the firearm to Bushay's girlfriend, but because the girlfriend was sleeping, Yee put it under his mattress. A subsequent telephone call between Bushay and his girlfriend confirmed that she knew the gun was under Yee's mattress. [*Id.* at 12]. Gordon had included in his affidavit a statement that based on his training and experience, drug traffickers very often possess firearms for the purpose of protecting their drug trafficking enterprise from the efforts of law enforcement and those who might attempt to steal drugs or money from them. [Doc. 327-1 at 5].

Gordon also related that law enforcement was unable to conduct trash pulls at the location, concluding that because drug traffickers are aware that law enforcement commonly conducts trash pulls at drug dealers' residences, Bushay and Tomlinson did not put trash outside the residence in an effort to thwart law enforcement's efforts. [*Id.* at 13]. Gordon also stated that since September 2010, Bushay, Tomlinson,

66

and "Club Intrigue" received six UPS packages at Grey Rock. Finally, Gordon opined that based on geo-location data, Bushay was using Grey Rock as his principal residence. [*id.* at 13-14].

### 2. Bushay's contentions

Bushay first argues that the evidence at best demonstrates that there was contraband at the residence no later than October 5, 2010, when the residence was cleaned out, and thus the December 15 warrant application was stale and untimely. He argues that experience indicates that drug dealers change residences and "drop" cell phones in order to evade detection, and thus it was highly improbable that drugs or currency would be at the Grey Rock on December 15. [Doc. 327 at 5]. He also argues that the affidavit failed to establish a nexus between the crimes under investigation and the location to be searched. [*Id.* at 6-7].

### 3. Analysis

The Grey Rock warrant was supported by probable cause. The evidence shows that Bushay and Tomlinson were using the residence to facilitate their drug-dealing activities. Contrary to Bushay's argument, the information in the affidavit was not stale. From April through October, the residence was used to further their drug-trafficking activities. Unlike the example given by Bushay in his motion,

67

however, Bushay did not abandon the residence, but instead continued to use it as his residence. He and Tomlinson continued to use it to receive UPS packages, Bushay frequently slept there, his girlfriend and brother stayed there, and at least one firearm was kept under a mattress at that location. Notably, there is indication that the occupants avoided placing their trash outside for pickup in order to thwart a law-enforcement trash pull. The affidavit did not state that the trash was inspected yet no evidence was found; instead, the affidavit relates that the occupants did not put the trash outside. An experienced law-enforcement officer could reasonably find this behavior very suspicious, and the issuing Magistrate Judge was justified in considering this evidence as probative of the continuation of Bushay and Tomlinson's use of the premises in their drug dealing. Thus, based on the nature of the crime under investigation, the issuing magistrate judge was authorized to conclude that the supporting affidavit was not stale and that probable cause existed.

As for the required nexus, the affidavit demonstrated that Bushay and Tomlinson used the premises to facilitate their narcotics trafficking, first - - at a minimum - - as a meeting point between Tomlinson and Hargreaves before Hargreaves was stopped with over $101,000 in her vehicle, and second as a place to store controlled substances and a van with a secret compartment. Also, since Grey Rock was used as Bushay's

principal residence, it was reasonable for the issuing judge to infer that records, currency, firearms and other evidence of Bushay's narcotic trafficking would be stored at that location.

As a result, the undersigned **RECOMMENDS** that Bushay's motion to suppress evidence seized as a result of the search warrant at 6746 Grey Rock Way, Lithonia, Ga., be **DENIED** without an evidentiary hearing.

### III. Motion to sever defendant re: Bruton problem, [Doc. 283]

In this motion, Bushay seeks a severance from any of his co-defendants who made statements implicating him, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).[25]   However, his motion does not state which co-defendant, if any, made statements implicating *Bruton*, and if any of them did, whether any such co-defendants are going to trial or have pleaded guilty.  As such, the Court is unable to evaluate the

---

[25]     In *Bruton*, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that facially incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses.  The Supreme Court concluded that "where the powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements.  *Bruton*, 391 U.S. at 135-36.

69

motion and any remedial efforts undertaken by the government to avoid a *Bruton* problem.

As a result, the undersigned **DEFERS** the motion for severance, [Doc. 283], to the District Court.

## IV.    *Conclusion*

For all of the above reasons, the undersigned **RECOMMENDS** that the following motions filed by Defendant Jerome Bushay be **DENIED**:

(1) motion to suppress statements, [Doc. 155];

(2) motion to suppress evidence, [Doc. 156];

(3) first motion to suppress search and seizure re: 943 Peachtree, Apt. 707, [Doc. 278];

(4) supplemental motion to suppress search and seizure re: 943 Peachtree, Apt. 707, [Doc. 326];

(5) first motion to suppress search and seizure re: 6746 Grey Rock Way, [Doc. 279];

(6) supplemental  motion to suppress search and seizure re: 6746 Grey Rock Way, [Doc. 327]; and

(7) motion to suppress search and seizure re: hotel room, [Doc. 280].

AO 72A
(Rev.8/8
2)

The Court further **RECOMMENDS** that the motion to suppress search and seizure re: traffic stop, [Doc. 282], be **GRANTED AS MOOT**.  The motion to sever defendant re: *Bruton* problem, [Doc. 283], is **DEFERRED TO THE DISTRICT COURT**.

The Court has now ruled on all of this Defendant's pretrial motions.  As a result, the case is **CERTIFIED READY FOR TRIAL AS TO THIS DEFENDANT**.[26]

**IT IS SO RECOMMENDED, ORDERED and CERTIFIED**, this the 24th day of January, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[26]     Since matters pertaining to Defendant's codefendants are still pending, the District Court is not required to place this Defendant's case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).

AO 72A
(Rev.8/8
2)