IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,   )
                            )   CRIMINAL ACTION FILE
v.                          )
                            )   NUMBER 1:10-cv-521-1-TCB-AJB
JEROME BUSHAY,              )
                            )
            Defendant.      )


<u>O R D E R</u>

This matter is before the Court on Defendant Jerome Bushay's objections [489] to Magistrate Judge Baverman's Report and Recommendation (the "R&R") [476], which recommends that the Court deny Bushay's motion to suppress statements [155]; motion to suppress evidence [156]; motion to suppress search and seizure re: 6746 Grey Rock Way [279 & 327]; motion to suppress search and seizure re: 943 Peachtree Apt. 707 [278 & 326]; and motion to suppress search and seizure re: hotel room [280]. The R&R further recommends that Bushay's motion to suppress search and seizure re: traffic stop [282] be granted as moot and

defers his motion to sever defendant re: *Bruton* problem [283] to this Court for determination.

## I.    Background

On December 14, 2010, the grand jury returned an indictment against Bushay and his co-Defendants Otis Henry, Christopher Dixon, Mark Tomlinson, Rashaun Hood, Curtis Hernandez, Nigel Edwards, Jermaine Campbell, Ricardo Duncan, Dave Grant, Christopher Williams, Damien Aarons and Conrad Harvey.  The indictment charges all Defendants as part of a conspiracy to commit drug-related offenses and charges them with the underlying substantive offenses of the conspiracy, which include two counts of possession with the intent to distribute marijuana, three counts of possession with the intent to distribute methylenedioxymethamphetamine (MDMA), and two counts of possession of a firearm in furtherance of a drug trafficking crime.

Bushay filed the motions currently before the Court seeking to suppress the seizure of a firearm from a hotel room in Tampa, Florida; his statements made to police following his arrest in Florida; evidence gained through the searches of two residences in Georgia; and evidence gained through a traffic stop.  Additionally, Bushay seeks a severance pursuant to

*Bruton v. United States*, 391 U.S. 123 (1968), from any of his co-Defendants who made statements implicating him.

On September 22, 2011, Magistrate Judge Baverman held an evidentiary hearing on Bushay's motions to suppress evidence from the search of the Tampa hotel room and his post-arrest statements.

On February 7, 2012, Judge Baverman issued an R&R setting forth his findings of fact from the evidentiary hearing and recommending that all of Bushay's motions to suppress, except his motion to suppress evidence from an October 4, 2010 traffic stop in Lamar County, Georgia, be denied. As to the traffic stop, Judge Baverman recommended that this motion be granted as moot because the Government announced at the evidentiary hearing that it did not intend to introduce any evidence from the traffic stop at trial. Bushay timely filed objections to the R&R challenging Judge Baverman's findings of fact and conclusions of law made in response to his motions to suppress.

II.    Analysis

A.    Legal Standard

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732

(11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982)).[1] This review may take different forms, however, depending on whether there are objections to the R&R. The district judge must "make a de novo determination of those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

"Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n. 4 (11th Cir.2009) (discussing the continuing validity of *Nettles*).

[2] *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373–74 (N.D. Ga. 2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

The Court has conducted a careful, de novo review of the report and recommendation and Bushay's objections thereto. Having done so, the Court finds that Magistrate Judge Baverman's factual and legal conclusions were correct and that Bushay's objections have no merit.

**B.  The Tampa Hotel Search, the Agents' Seizure of the Gun, and Bushay's Post-Arrest Statements**

**1.  Judge Baverman's Findings of Fact**

Based on the evidence presented by the parties at the September 22 hearing, Judge Baverman made the following findings of fact regarding the search of the Tampa hotel room, the seizure of a gun from that room, and Bushay's post-arrest statements to police.

On December 15, 2010, Drug Enforcement Administration ("DEA") Atlanta Task Force Officer ("TFO") T.K. Gordon called TFO Jeff McConaughey of the Pinellas County, Florida Sheriff's Office to advise him that several individuals who had been indicted in Atlanta, and for whom arrest warrants had been issued, were in the Tampa area.  At the time of the call, McConaughey had been conducting an investigation of one of Bushay's co-Defendants, Christopher Williams.  McConaughey assembled a team of DEA agents and TFOs and went to an area northeast of Tampa near the fairgrounds, where there are several hotels.  The agents did not know which hotel the individuals were staying in, but had learned through Title III wire intercepts that the subjects were in room 308 of one of the hotels in that area.  Agents then observed Bushay and Williams leaving the Fairfield Inn in a van and followed them to an IHOP restaurant near downtown Tampa.

Agents continued to surveille the suspects while they were inside the IHOP. When the men went to leave the restaurant, agents arrested them. In searching Bushay, McConaughey found two plastic credit-card-type hotel room keys. Agents placed Bushay in the back of a marked police car, but did not advise him of his *Miranda* rights at that time because they did not intend to question him at the scene.

Once at the DEA office, McConaughey took Bushay to the processing and interview room. At that time, McConaughey was not armed. McConaughey did not threaten Bushay or make him any promises. McConaughey read Bushay his rights from a DEA Form 13A, T21, which provides,

> Before we ask you any questions, you must understand that you have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. Do you understand? Are you willing to answer some questions?

Bushay replied, "Yes, I'll talk to you." McConaughey did not present Bushay with a written waiver form. McConaughey began questioning Bushay and asked him whether he had left any property at the hotel. Bushay responded that he had left a gun in the hotel nightstand.

DEA Task Force Agents Nicholas Marolda and Dexter McGee went to the Fairfield Inn with the plastic keys that agent McConaughey had found on Bushay in order to retrieve the gun. They knocked on the door of room 308, and after a few seconds Keisean Scarlett opened the door. When Marolda identified himself as a law-enforcement agent, Scarlett tried to shut the door; however, Marolda stuck his foot in the door. Scarlett turned around and moved towards the bed. The agents drew their weapons but did not enter the room. Instead, they verbally commanded Scarlett to return to the door while showing his hands and then to get on the floor. Scarlett complied, and the agents handcuffed him.

Scarlett told the agents, and they observed, that another person, subsequently identified as Chadwick Williams, was in the room sleeping. The agents told Williams to show his hands, and after several requests he complied and the agents secured him. The agents then placed Scarlett and Williams in the hallway inside the hotel room and conducted a sweep of the room for the presence of any other persons.

After sweeping the room, the agents brought Scarlett and Williams back into the room and seated one on a chair and the other on a bed. Marolda explained that the agents were there to search the room for a

firearm. Marolda asked Scarlett if there was a gun in the room, and he replied that it was in the nightstand between the beds. Scarlett told Marolda that he was going to call "Jerome" to ask why he left the gun in the room. Marolda seized the firearm from the nightstand, and gave it to McGee, who cleared it and secured it.

At approximately 12:35 p.m., Scarlett and Williams signed a consent-to-search form for the room, but Marolda could not say whether the form was signed before or after the firearm was seized. He also testified that he "had consent to search the room—verbal consent to search the room and then we had written—and then we received written consent as well."

Meanwhile, back at the Tampa DEA office, Gordon called McConaughey on his cell phone around 1:17 p.m. McConaughey handed the phone to Bushay in order for Gordon to record a voice exemplar. Although McConaughey could not hear Gordon's side of that conversation, Bushay did not invoke his right to an attorney while speaking with Gordon, nor did he invoke his right to remain silent. After Bushay spoke with Gordon, McConaughey began questioning Bushay about the Atlanta case, particularly whether Williams was involved in the Atlanta case with him.

At that point, Bushay responded, "I better talk to an attorney first." McConaughey did not question Bushay further.

### 2.    Judge Baverman's Conclusions of Law

In evaluating Bushay's motions to suppress the search of the hotel room, the seizure of the gun, and Bushay's post-arrest statements, the magistrate judge concluded the following.

First, Judge Baverman concluded that Bushay lacked standing to challenge the agents' search of the hotel room because he did not establish that he had a subjective or objective expectation of privacy in the hotel room.  As to Bushay's subjective expectation of privacy, the magistrate judge concluded that Bushay did not show that he had an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee. Specifically, Bushay failed to establish that the room was rented in his name, that he paid for the room, or that he was the registered additional guest.

In reaching this conclusion, Judge Baverman found significant that Bushay described his presence in the area as having "met friends"; referred to "the" hotel room rather than "his" hotel room; never proved that the two

plastic keys were in fact the keys to room 308; did not prove that the vehicle he was operating at the time of his arrest was a vehicle registered for room 308; was not using the hotel for lodging; and kept no personal items in the room other than the gun. Although Bushay argued that the fact that the agents believed that he was staying in the room helped prove his standing, Judge Baverman found this argument unpersuasive because a defendant may not establish standing by relying on the government's theory of the case. Because he could not establish that the hotel room was his, nor could he establish that he was an overnight guest, Judge Baverman found that Bushay had not established that he had a subjective expectation of privacy. Further, he concluded that Bushay had also failed to establish an objective expectation of privacy in the hotel room because at most he was only a casual visitor.

Second, Judge Baverman considered whether Bushay had standing to challenge the agents' seizure of the firearm even though he had no standing to challenge the agents' search of the hotel room. He concluded that a defendant cannot assert standing to challenge a seizure based on a possessory interest in the item seized when has no expectation of privacy in the area searched. Further, he found that even if Bushay could establish

standing on such a basis, he had failed to show that he had a possessory interest in the handgun sufficient to establish an expectation of privacy in the gun itself. He based this conclusion on his findings that Bushay left the gun unsecured in a hotel room in which he had no cognizable expectation of privacy; Bushay did not leave the gun in a personal belonging such as a coat or case; the gun was not registered in Bushay's name; Bushay did not tell Scarlett that he left the gun in the nightstand; and Bushay did not prove that the keys removed from him at the time of the arrest were keys to room 308 and therefore had no way to retrieve the gun except through Scarlett.

Third, Judge Baverman addressed whether, in the event the Court were to find that Bushay does in fact have standing to challenge the agents' warrantless search of the hotel room and the subsequent seizure of the gun, the search and seizure was proper. He concluded that the Government did not prove that Scarlett or Williams voluntarily consented to a search of the hotel room, either through oral or written consent. However, he concluded that the agents' seizure of the gun was nevertheless reasonable under the exigent-circumstances exception to the warrant requirement. According to the magistrate judge, it would have been unreasonable for the agents to have simply left the firearm in the nightstand where it could pose

significant danger to hotel employees or future guests of room 308. Thus, the gun presented a danger to the public that the agents were authorized to mitigate by seizing the weapon.

Fourth, the magistrate judge considered whether Bushay's post-arrest statements were lawfully obtained, i.e., whether the Government proved that the agents satisfied the *Miranda* requirements and that Bushay's statements were obtained freely and voluntarily. He found that McConaughey read Bushay his *Miranda* rights from a DEA Form 13A, so Bushay was made aware of his rights, and Bushay responded by saying that he was willing to talk with McConaughey. Furthermore, Bushay's statements were voluntary because there was no evidence that McConaughey promised him any benefit or threatened him, the questioning was not prolonged, and the fact that Bushay exercised his right to stop answering questions during the interview demonstrated that he recognized that he had a choice not to answer any questions.

### 3. Standing

Bushay first objects to Judge Baverman's conclusion that he lacked standing to challenge the search of the Tampa hotel room and the seizure of the firearm. He contends that he has demonstrated a subjective

expectation of privacy in the premises because the evidence shows that he was staying in room 308 of the Fairfield Inn.  Additionally, Bushay argues that contrary to the R&R's conclusion, he has standing to challenge the agents' seizure of the gun because the seizure infringed upon his possessory rights.

### a.  Bushay's Expectation of Privacy in Room 308

Bushay objects to several of the R&R's factual findings and legal conclusions regarding his subjective expectation of privacy in the hotel room.  First, he argues that Judge Baverman incorrectly concluded that "while Bushay possessed two hotel room keys, he never proved that these keys in fact were the keys to room 308."  Bushay contends that the fact that the agents went immediately to room 308 of the Fairfield Inn and seized the firearm from inside the nightstand proves that the keys belonged to that room.  The Court disagrees.

The facts show that upon searching Bushay the agents confiscated two plastic keys.  They also knew from the Title III wire communication that he was staying in room 308 of a local hotel.  Based on their surveillance, they believed that Bushay was staying at the Fairfield Inn.  When Bushay was arrested, he had two plastic key cards in his sleeve.

During his post-arrest questioning, he told the agents that he had left his gun in the nightstand of the hotel room. Thus, there was an inference that the plastic cards went with the hotel room. However, the agents never used the keys to enter the room. Instead, they knocked on the door and Scarlett opened it. Therefore, the fact that the agents went to the hotel room and seized the gun does not prove that the keys belonged to room 308. The Court agrees with the R&R that under the facts, Bushay failed to prove that the keys belonged to room 308.

Bushay next disagrees with the magistrate judge's conclusion that he relied upon the Government's theory of the case in proving his standing. He contends that he relied upon the direct and circumstantial evidence proved by the agents to meet his burden. In support of his contention, he points to McConaughey's testimony that it was "implied" that the hotel room was Bushay's. This testimony does not rebut the R&R's conclusion. McConaughey's testimony simply shows that the agents believed that the hotel room was Bushay's. But as the R&R explained, Bushay cannot rely on the Government's beliefs, i.e., its theory of the case to prove his standing because he ultimately carries the burden of proving his standing. *See United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993); *see also*

*United States v. Ruth*, 65 F.3d 599, 604–05 (defendant could not carry his burden "simply by relying on the facts cited in the Federal Affidavit for a search warrant and testimony by [a DEA agent] at one of the hearings on the motion to suppress").

Bushay also contends that the magistrate judge erroneously concluded that he was merely a casual visitor who was briefly present with the consent of the room holder. He asserts that the evidence establishes that he was actually staying in room 308. In support of his argument, Bushay points to five facts: (1) he announced on the phone that the men were staying in room 308; (2) agents saw Bushay getting into his car in the parking lot of the hotel; (3) when arrested, he had two keys to room 308; (4) after his arrest, he informed agents that he had left his gun back at his hotel room in the nightstand; and (5) Scarlett informed agents that Bushay left his gun in the nightstand.

The Court does not find this argument persuasive. As explained above, Bushay never proved that the keys belonged to room 308. Additionally, neither the agents seeing Bushay get into his car outside the hotel room, Bushay informing the agents that his gun was back at the hotel room, nor Scarlett informing the agents that Bushay left his gun in the

nightstand makes it more probable that the hotel room was Bushay's as opposed to its being Scarlett's and Bushay having simply been a casual visitor who left his gun there.

The fact that on the phone call Bushay said that the men were staying in the room is more helpful to Bushay. However, Bushay did not show that he had an unrestricted right of occupancy or custody and control of the room as distinguished from occasional presence in the room as a mere guest or invitee. Afterall, Bushay had no personal belongings in the room other than the gun and did not stay in the room overnight. The magistrate judge correctly found that Bushay did not show that the room was rented in his name, that he paid for the room, that the van he was driving was registered to the room, or that he was registered as an additional guest. Thus, the Court agrees with the magistrate judge's conclusion that in light of the totality of the evidence presented, Bushay did not carry his burden of establishing that the room was his.

As to his objective expectation of privacy, Bushay contends that according to the Supreme Court's holding in *Minnesota v. Carter*, 525 U.S. 83, 90 (1998), he was a social guest with a reasonable expectation of privacy because there is no evidence that men were using the room

predominantly to engage in narcotics trafficking. Bushay's reliance on *Carter* is misplaced. There, the Court held that based on the "purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between [defendants] and the householder," defendants did not have a subjective expectation of privacy. However, the absence of a purely business or illegal purpose does not compel the opposite conclusion, i.e., that the defendant does have standing.

As the Court explained in *Carter*, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* at 90. Thus, the Court must determine whether Bushay was an overnight guest or merely present in the room. The essence of this inquiry is whether the defendant has "demonstrate[d] a significant and current interest" in the property at the time it was searched. *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984). To have an expectation of privacy in a hotel room that he did not rent, Bushay must show "an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee." *United States v. Baron–Mantilla*,

743 F.2d 868, 870 (11th Cir. 1984).  The Court agrees with Judge Baverman's conclusion that Bushay has failed to make this showing. Instead, the facts show that he was not using the hotel for lodging, produced no evidence that he had personal belongings (other than the gun) in the room, and told McConaughey that he was at the hotel to meet friends.

Bushay also argues that he demonstrated an objective expectation of privacy by being the sole possessor of the room keys.  As set forth above, Bushay has failed to prove that the keys belonged to room 308.  Moreover, Bushay has not submitted any evidence demonstrating that there were only two keys to the room.  Even if Bushay had proved that the two keys in his possession were the keys to room 308, since Scarlett and Williams were in the room when the agents arrived, it seems reasonable that the hotel could have issued more than two plastic keys to the room.

The Court will therefore adopt the R&R's conclusion that Bushay did not have a subjective or objective expectation of privacy in the hotel room.

### b. Bushay's Possessory Rights in the Gun

Bushay also contends that, contrary to Judge Baverman's conclusion, he established standing based upon his possession and property interests in the gun. In support of his argument, he relies on *Soldal v. Cook County*, 506 U.S. 56, 64 (1991), for the proposition that a defendant need only establish that a seizure interfered with his possessory rights in order to challenge the seizure. The R&R considered *Soldal*'s application to the facts of this case and concluded,

> *Soldal* is distinguishable because that case did not involve Fourth Amendment standing or an expectation of privacy at all, but rather discussed whether the plaintiffs could bring a 42 U.S.C. § 1983 action against local law enforcement for the claimed unlawful seizure of their mobile home even if their privacy was not infringed under the Fourth Amendment. *Soldal*, 506 U.S. at 72. While the Court there concluded that an improper seizure was actionable, that case did not address the question in the present case: whether a defendant can assert an improper-seizure claim to property seized from a location in which he has no legitimate expectation of privacy; in *Soldal*, the plaintiffs were literally dispossessed from their property.

R&R at 26.

In *Soldal*, the Supreme Court described the issue before it as "whether the seizure and removal of the Soldals' trailer home implicated their Fourth Amendment rights." 506 U.S. at 61. The Seventh Circuit had held that the Soldals' Fourth Amendment rights had not been violated

because the officers who facilitated the removal of their mobile home had not violated the Soldals' privacy or liberty interests because they had not conducted a search.  However, the Court explained that the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'  A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interests in that property."  *Id.* at 63 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

The Court then looked to its decisions in *Jacobsen* and *United States v. Place*, 462 U.S. 696, 708 (1983), and explained that in those cases, because there was an invasion of the property owners' possessory interests, i.e., a seizure, regardless of whether the owners' privacy interests had been violated through a search, the issue was whether the seizures were reasonable under the Fourth Amendment.  The *Soldal* Court made clear that "[a]lthough lacking a privacy component, the property rights in both [*Jacobsen* and *Soldal*] nonetheless were not disregarded, but rather were afforded Fourth Amendment protection."  506 U.S. at 65.  Thus, the Court in *Soldal* seemed to imply that a person may challenge a seizure of his

property based on his property interest, even when he lacks a privacy interest.

However, as Judge Baverman noted, *Soldal* was not about a criminal defendant's standing to challenge the seizure of personalty in a criminal proceeding. In fact, in considering the potential implications of its decision, the Court commented on how its holding might affect "routine repossessions, negligent actions of public employees that interfere with individuals' right to enjoy their homes, and the like." *Id.* at 71. Nowhere did the Court even mention the case's effect on standing in criminal cases.

In his reasoning, Judge Baverman also noted that he "has not been directed to any cases, and has found none, where a court permitted someone like Bushay—at most a casual visitor—to invoke the Fourth Amendment to challenge the seizure of his own property when the visitor was not present at the time of the search and seizure." Indeed, such cases are extremely limited, but this Court has found two on point.

First, in 1975, when Justice Stevens was a Circuit Judge for the Seventh Circuit, he wrote the opinion in *United States v. Lisk*, 522 F.2d 228 (7th Cir. 1975), which considered whether a defendant could establish standing to challenge a seizure based solely on his property interest in a

bomb.  The defendant had stored a bomb in the trunk of a friend's car, and police searched the car and seized the bomb.  The defendant was not in the car at the time of the seizure.  Thus, like Bushay, the defendant had no expectation of privacy in the area searched and was not present for the search.  The court held that the defendant clearly lacked standing to object to the search of the car because he had no expectation of privacy in the third party's car.  In determining whether the defendant had standing to challenge the seizure, the court began its analysis by noting, "Although the issue seems simple and clear-cut, and certainly the problem must be one that frequently arises, we have been surprised to find no authority directly on point."  *Id.* at 230.  The court then explained, "There is a difference between a search and a seizure.  A search involves an invasion of privacy; a seizure is a taking of property.  The owner of a chattel which has been seized certainly has standing to seek its return."  *Id.*  Setting forth little other reasoning for its decision, the court held that based on the defendant's property interest in the bomb, the defendant had standing to object to the seizure.[3]

---

[3] Although the court found that the defendant had standing to challenge the seizure, it nevertheless found the seizure legal, explaining that "[i]f the seized item was contraband or the product of criminal activity, it was clearly subject to seizure."  *Id.*

In a footnote in *United States v. Salvucci*, 448 U.S. 83, 91 n.6 (1980), the Supreme Court seemingly endorsed the Seventh Circuit's holding in *Lisk* when citing to it for the proposition that "[l]egal possession of the seized good may be sufficient in some circumstances to entitle a defendant to seek the return of the seized property if the seizure, as opposed to the search, was illegal." But, importantly, the Court did not say that a defendant's legal possession of an item would be sufficient to confer standing upon him to seek suppression of the seized good in a legal proceeding against him—only that it would entitle him to seek the return of his seized property. The Court did not explore the issue in depth because the defendants did not challenge the constitutionality of the seizure, only the search.[4]

The second case concluding that a criminal defendant has standing to contest a seizure based on his property interest in the item seized is the

---

[4] In *Salvucci*, the Court considered whether to uphold its decision in *Jones v. United States*, 362 U.S. 257 (1960), which accorded "automatic standing" to a defendant charged with a crime of possession who challenged the legality of the search which produced evidence against him. The Court overruled *Jones* and in doing so held that "[w]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated . . . property rights are neither the beginning nor the end of this Court's inquiry. . . . [A]n illegal search only violates the rights of those who have a legitimate expectation of privacy in the invaded place." 448 U.S. at 91–92. It is not entirely clear whether *Salvucci* was limited to the relationship between property interests and searches (not seizures).

District of Massachusetts's decision in *United States v. Battle*, 400 F. Supp. 2d 355 (D. Mass. 2005). In *Battle*, the defendant contested the seizure of a handgun and ammunition from a bureau drawer in a third party's apartment. The court found that the defendant did not have standing to challenge the search because he had no expectation of privacy in the third party's home, but that under *Lisk* and *Salvucci* he was not foreclosed from challenging the seizure of the handgun and ammunition.[5] However, after conducting this in-depth analysis, the court noted that the defendant had not actually challenged the seizure, only the search; thus, its analysis is dicta.

Because *Battle* is dicta, in thirty-five years only one case—*Lisk*—has adopted the proposition Bushay maintains: that a criminal defendant has standing to challenge the seizure of a chattel based solely on his property interests therein. In the face of such scant authority, the Court refuses to recognize such broad standing rights. The Court will therefore adopt Judge Baverman's conclusion of law that Bushay cannot establish standing to

---

[5] The court ultimately concluded that the seizure was reasonable because the third party who lived at the apartment had consented to the seizure.

challenge the seizure of the gun based on his alleged property right in the gun.[6]

Additionally, the Court will adopt Judge Baverman's conclusion that even if Bushay had standing to assert that evidence of the seizure should be suppressed based on his property or possessory interest in the gun, Bushay has not established any such interest. As the magistrate judge concluded, Bushay was not in possession of the gun when the agents seized it, he had left the gun in a hotel room in which he had no expectation of privacy, and the gun was not registered to him. Thus, Bushay did not show that he had any interest in the gun, possessory or otherwise.

### 4. Seizure of the Gun

Bushay agrees with Judge Baverman's conclusion that the agents did not gain Scarlett's or Williams's consent before searching the room. However, he objects to the magistrate judge's conclusion that the warrantless search was nonetheless proper under the exigent-circumstances exception to the warrant requirement. Bushay contends that because he was in custody miles away from the hotel, Scarlett and Williams

---

[6] Even if the Court were to find that Bushay had a property interest in the gun and applied *Lisk* to hold that he has standing to contest the seizure of the firearm, the seizure did not violate the Fourth Amendment because, as explained below, the search was reasonable.

were not convicted felons, and there was no evidence that the gun was the evidence of a crime or shooting, no exigent circumstances existed.

This objection is meritless. Based on the danger that the gun presented to the public, the agents reasonably seized it from the hotel room. The Court will therefore adopt the magistrate's conclusion that the seizure of the gun was reasonable.

### 5. Bushay's Post-Arrest Statements

Bushay also objects to Judge Baverman's conclusion that Bushay's statements complied with *Miranda* and were voluntary. He argues that the agents failed to obtain a written waiver and that under the "traumatic" circumstances of his arrest and detention, his statements were not voluntary.

First, the agents' failure to obtain Bushay's written waiver is not determinative of whether Bushay effectively waived his *Miranda* rights. The government "does not need to show that a waiver of *Miranda* rights was express," and an "implicit waiver" of *Miranda* rights is sufficient. *Berghuis v. Thompkins*, ___ U.S. ___ , 130 S. Ct. 2250, 2261 (2010); *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010). Indeed, the Eleventh Circuit has held that a defendant may impliedly waive his *Miranda* rights by

voluntarily making statements, even when he has explicitly refused to sign a written waiver. *United States v. Dowd*, 451 F.3d 1244, 1250–51 (11th Cir. 2006) (where defendant "continued talking immediately after declining to sign the waiver" and "did not suggest even equivocally that he wished to cease questioning," he impliedly waived his *Miranda* rights, notwithstanding his failure to sign the waiver form).

As Judge Baverman explained, an accused effectively waives his *Miranda* rights if he (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion, or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Wright*, 300 F. App'x 627, 630 (11th Cir. 2008) (citing *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995)). A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *Id.*

Here, McConaughey read Bushay his *Miranda* rights from a DEA Form 13A, thus making him aware of his rights. And when McConaughey asked Bushay whether he was willing to answer questions, Bushay said that

he was willing to talk.  McConaughey did not promise Bushay any benefit or threaten him in any manner, and the questioning was not prolonged.

Nonetheless, Bushay contends that his waiver was not voluntary.  He claims that "like an arrest scene out of so many movies, he was stormed by ten to fifteen armed agents who had their guns drawn, their badges flashing and their raid gear on display."  According to Bushay, he was then "dragged from the driver's seat and thrown to the ground face-first," handcuffed, "and then whisked away to an unfamiliar place, the bowels of a DEA office" where agents questioned him in a twelve-by-twelve-foot interrogation room.   Bushay insists that the "average person would be traumatized by the arrest process to which [he] was subjected."

Indeed, many people would likely find being arrested to be a traumatic event, and any arrest involves a certain degree of duress.  But the issue is not whether the "average person" would be "traumatized" by the arrest process to which a defendant is subjected.  Instead, the Court must consider whether the defendant voluntarily relinquished his right by making a free and deliberate choice, i.e., a choice that was not the product of intimidation, coercion or deception.  As set forth in the R&R, sufficiently coercive conduct normally involves subjecting the accused to an

exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Colorado v. Connelly*, 479 U.S. 157, 163 n.1 (1986); *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988); *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362–63 (11th Cir. 1984). Although the agents used physical force to secure Bushay's arrest, they did not use force after Bushay was restrained. Once inside the interrogation room, the agents did not subject Bushay to a long interrogation, apply any physical force, or make any promises. Thus, despite Bushay's dramatic characterization of his arrest and questioning, the Court agrees with Magistrate Judge Baverman that the agents did not coerce, deceive or intimidate Bushay into waiving his rights.

The Court will therefore adopt the R&R's recommendation to deny Bushay's motion to suppress his post-arrest statements.

## C. The Searches of 943 Peachtree, Apt. 707 and 6746 Grey Rock Way

Finally, Bushay objects to Judge Baverman's conclusion that Bushay's motion to suppress evidence seized as the result of two federal search warrants for 943 Peachtree, Apt. 707 and 6746 Grey Rock Way. In his objections, Bushay states that he "reiterates" that "probable cause was

lacking on the face of the warrant affidavits, and the information in the affidavits [supporting the warrant applications] was stale." This reiteration basically mirrors the arguments he raised in his supplemental motions to suppress these searches [326 & 327]. Because Judge Baverman addressed each of Bushay's arguments in the R&R, and the Court agrees with the R&R's thorough reasoning and conclusions, the Court sees no need to provide additional analysis on this issue.

III.    Conclusion

The Court has also reviewed those sections of the R&R to which Bushay did not object and finds no clear error.

Accordingly, the Court ADOPTS AS ITS ORDER the Report and Recommendation. The Court DENIES Bushay's motion to suppress statements [155]; motion to suppress evidence [156]; motion to suppress search and seizure re: 6746 Grey Rock Way [279 & 327]; motion to suppress search and seizure re: 943 Peachtree Apt. 707 [278 & 326]; and motion to suppress search and seizure re: hotel room [280].

Bushay's motion to suppress search and seizure re: traffic stop [282] is DENIED AS MOOT.

Additionally, Bushay is DIRECTED to supplement his motion to sever defendant re: *Bruton* problem [283] within twenty-one days from the issuance of this order. The Government will then have fourteen days to respond to his supplemented motion, and Bushay may then file a reply within fourteen days of the Government's filing of its response brief. If Bushay does not file a supplemental brief within this period, the Court will deem the motion abandoned.

IT IS SO ORDERED this 12th day of March, 2012.

_____
Timothy C. Batten, Sr.
United States District Judge